J. H. BROWN, Appellee, v. S. L. MARTIN, Appellant.

No. 41805.

May 15, 1933.

Rehearing Denied December 14, 1933.

Hallagan, Fountain & Stewart, and Dyer, Jordan & Dyer, for appellant.

Doran, Boone & Doran, for appellee.

Donegan, J.—Plaintiff and defendant were both engineers in the employ of the Chicago & Northwestern Railway Company, and were residents of Boone, Iowa. They had been associated as such coemployees of the railway company for about forty years. On November 14, 1930, plaintiff and defendant, together with one Adkins, who was a locomotive fireman in the employ of said railway company, set out on a hunting trip from Boone, Iowa, to the vicinity of Humboldt, Iowa. The route which they pursued took them through the city of Fort Dodge, Iowa, and from there they proceeded northward over paved highway No. 169. About 8 miles north of Fort Dodge the pavement ended, and there was a stretch of graveled road extending from the end of the pavement for about one-half mile northward to what was known as the Butterworth corner. The car in which they were riding was a Studebaker President eight sedan. Defendant was the owner of this car, and was seated in the left-hand front seat driving, and plaintiff was also in the front seat to the right of defendant. The other passenger, Adkins, was in the back seat. As they approached the end of the paved road, there was a sign approximately 400 feet to the south of the end of the pavement which contained the words "Pavement Ends". Between this sign and the end of the pavement there was another sign which may be referred to as the "Road under Construction" sign. About or perhaps a short distance south of the "Pavement Ends" sign there was a slight rise in the road, and from

there to the northward there was a slight down grade for some distance beyond the scene of the accident. From the end of the pavement northward to the Butterworth corner, the road was maintained as a graveled primary road. Where the gravel joined the pavement there was a stretch of approximately 30 feet in which the grade had been raised and new gravel placed thereon to meet the end of the pavement. This gravel extended slightly over the north end of the pavement so that there was no drop off at the end of the pavement. As the automobile proceeded northward off the end of the pavement and reached a point approximately 30 to 50 feet north thereof, it began to swerve. Defendant tried to right it and direct its course along the roadway, but was unable to do so, and, at a point about 150 feet from the end of the paving, the automobile turned over in the road. After turning over the first time, it again turned over once or perhaps twice, and stopped standing upright on its wheels and facing southward in a shallow ditch to the right or east side of the road, at a point approximately 270 to 300 feet north of the end of the pavement. The passenger, Adkins, appears to have been thrown out of the automobile when it turned over the first time. The top covering of the automobile was torn off as it turned over, and when it turned over the second time both the plaintiff and defendant were thrown out on the road. As a result of the accident, the plaintiff received injuries for which he sued.

Plaintiff was the guest of the defendant without hire, and in his petition he alleged that the accident and injuries sustained by him were caused by the reckless operation of the car by defendant. In his petition plaintiff alleged a great many acts on the part of defendant which he claimed constituted recklessness, but the trial court reduced the charges of recklessness to two: First, that the defendant was reckless in operating his automobile at a high, dangerous, and excessive rate of speed as he drove off the pavement and onto the graveled portion of the highway; and, second, that he was guilty of reckless operation of said automobile in failing to have it under control at and prior to the time it was upset and plaintiff was injured. Defendant's answer admitted that plaintiff accompanied him on the automobile trip as his guest in an automobile owned and driven by the defendant, and that the accident occurred while so engaged, at or near the place described in plaintiff's petition, but denied all other allegations of plaintiff's petition, and specifically denied that any injuries sustained by plain-

tiff were caused by any recklessness on the part of the defendant.

On the trial of the case, after plaintiff had rested, defendant made a motion for a directed verdict in his favor, which was overruled. This motion was repeated at the close of all the evidence, and again overruled. The case was submitted to a jury which returned a verdict for the plaintiff. Defendant filed a motion for new trial and exceptions to instructions, which were also overruled by the court and judgment was thereupon entered upon the verdict. From the verdict and judgment and from all rulings of the court the defendant appeals.

Defendant sets out 33 grounds which he relies upon for reversal. The first and second errors relied upon for reversal are based, respectively, on the court's refusal to direct a verdict in favor of the defendant at the close of the plaintiff's evidence, and the court's refusal to direct a verdict in favor of the defendant when defendant's motion was renewed at the close of all the evidence. Several grounds are enumerated upon which defendant's motion for a directed verdict are based, but these grounds may be reduced to the general proposition that there was not sufficient evidence of defendant's reckless operation of the automobile to make this a question for the jury's determination.

The plaintiff was a guest not for hire in the automobile owned and driven by the defendant. This action is therefore governed by the provisions of section 5026-b1 of the Code of 1927, which is as follows:

"The owner or operator of a motor vehicle shall not be liable for any damages to any passenger or person riding in said motor vehicle as a guest or by invitation and not for hire, unless damage is caused as a result of the driver of said motor vehicle being under the influence of intoxicating liquor or because of the reckless operation by him of such motor vehicle."

This section of the Code was originally enacted as chapter 119 of the Acts of the 42d General Assembly, as an amendment to section 5026 of the Code of 1924. Prior to its enactment the owner or operator of an automobile was liable for all damages sustained by a passenger not for hire in such automobile, which were due to negligence of the driver. The effect of the amendment to the statute is to release the owner and operator from all damages to a guest who is a passenger not for hire, except in cases where the

damages are caused as the result of the driver being under the influence of intoxicating liquor or because of the reckless operation of the motor vehicle by the driver. There is no claim that the defendant in this case was under the influence of intoxicating liquor, and the only question we have for consideration is whether the damage done to the plaintiff was caused by the defendant's reckless operation of his automobile. The effect of the change of the statute and the meaning of the term "reckless operation" were first considered by this court in the case of Siesseger v. Puth, 213 Iowa 164, 182, 239 N. W. 46, 54. In that case Justice Grimm, in a very exhaustive opinion, set out the meaning of the words "reckless" and "recklessness", as given in the decisions of the courts of various jurisdictions, and said:

"In light of the circumstances under which said chapter 119 was passed, it is apparent, we think, that the legislature intended the word 'reckless' therein to mean 'proceeding without heed of or concern for consequences'. To be 'reckless', one must be more than 'negligent'. Recklessness may include 'wilfulness' or 'wantonness', but if the conduct is more than negligent, it may be 'reckless' without being 'wilful' or 'wanton', but to be reckless in contemplation of the statute under consideration, one must be more than negligent. Recklessness implies 'no care, coupled with disregard for consequences'."

In this opinion it was also held that recklessness, within the meaning of the statute, was not a degree of negligence, but was something entirely beyond and distinct from negligence.

Again, in the case of Neessen v. Armstrong, 213 Iowa 378, 383, 239 N. W. 56, 59, this court was called upon to consider the meaning of the term "reckless operation", and, speaking through Justice Wagner, we said:

"While, if the action were such as could be founded on negligence, the jury might be allowed to find, from the evidence, that the defendant was guilty of negligence,—that is, that he failed to exercise such care as an ordinarily careful and prudent person would have exercised under the same circumstances,—yet that does not solve the problem. This action is founded upon recklessness, which means more than negligence. It means proceeding without heed of, or concern for, consequences. See Siesseger v. Puth, 213 Iowa 164, 239 N. W. 46. In order for conduct to be reckless, within

the meaning of the law, it must be such as to manifest a heedless disregard for or indifference to the rights of others."

The meaning of the term "reckless operation", as contained in the statute and as thus interpreted by the Siesseger and Neessen cases, has been approved in the subsequent cases of Wilde v. Griffel et al., 214 Iowa 1177, 243 N. W. 159, and Levinson v. Hagerman et al., 214 Iowa 1296, 244 N. W. 307.

It is quite apparent from the language of the cases above cited that recklessness means something entirely distinct from and beyond negligence. In order to be guilty of recklessness it must be shown that the person charged acted without heed of or concern for consequences; that he exercised no care coupled with disregard for consequences; that there was a heedless disregard for or indifference to the rights of others. The question before us for determination, therefore, is, Did the defendant, Martin, act without heed of or concern for consequences, with no care, with a heedless disregard for, or indifference to, the rights of others? The record is devoid of any utterance or statement of the defendant from which such an attitude on his part could be inferred. If there was recklessness, therefore, it must be established by the conduct of the defendant in the light of the surrounding circumstances. What are the surrounding circumstances as shown by the evidence in this case, from which we are to conclude that the defendant showed such attitude as is necessary to constitute recklessness? Briefly, these circumstances, as insisted upon by the plaintiff, are that, disregarding two warning signs, defendant drove at a high rate of speed onto a graveled road which was so rough and full of ruts and holes that he must have seen it and realized its dangerous condition.

The first of the signs to which reference is made was the "Pavement Ends" sign, which the evidence tends to show was located about 400 feet south from the end of the pavement. This sign contained no warning as to any dangerous condition. The other sign to which reference is made was located between the "Pavement Ends" sign and the end of the pavement. The witnesses are not clear as to just what was on this sign but the substance of the testimony is that it contained the statements "Road under Construction", "Road kept open for your Convenience", and "Drive Carefully". It is admitted by all the witnesses that the graveled road from the end of the pavement to the Butterworth corner, which was a half mile in distance, was not under construction and had not been

under construction since the completion of the pavement to that point some time previously. Obviously, this sign had reference to a condition which had existed some time prior to the happening of this accident and not to a condition which was in existence at the time the accident occurred. The accident in question happened in broad daylight at a time when the general condition of the road for more than half a mile in front of the defendant, as he approached the end of the pavement, was plainly visible, and it cannot be said that the defendant was guilty of recklessness if he did not interpret either of these signs as a warning that a dangerous condition existed upon the graveled road.

Was the condition of the road itself such as to indicate that it was dangerous? Seven witnesses testified in behalf of plaintiff as to the condition of the road. Four of these witnesses, a Mr. and Mrs. Jacobsen, a Mr. Grant, and a Mrs. Hutchinson, were riding in an automobile which was going southward on the graveled road between the Butterworth corner and the end of the pavement.

The witness Grant said:

"I don't think there was very much of a drop there where it went off the pavement. It was just rough. There were ruts in the road. They weren't so deep. There wasn't any particular rut."

Mrs. Jacobsen testified that:

"It was rough right at the end of the pavement. I don't know whether you can see the ruts from the top of the hill as I didn't notice, as I knew they were there as I had been over the road dozens of times. I couldn't say it was rough right up to the pavement. They were just rough and were not awful deep. They were just like any rough road. There were no deep ruts. It was rough all over the road. I don't know whether you can see those ruts as you come down the hill before you come to the end of the pavement. It is not ruts, it is rough. It is just a roughness there rather than the road being full of ruts. It is just rough. It is not dug out or anything."

Mr. Jacobsen testified:

"When you are back a block or a block and a half south of the north end of the paving the condition of the road north of the paving would be visible to the eye. It was rough and chucky for about fifty paces I guess. I knew about the condition of the road

that day, that it was rough, but not from what I had seen from down on the pavement that day. Because I didn't pay a great deal of attention to it. I had been over it often before and have since. I was also over the road the day before the accident. As I remember the general condition of that road it was chucky and rough for about fifty paces starting at the end of the pavement. I know what condition it is in now. I don't know for sure what it was then. It was rough and chucky, would make a car bounce a little when you drive fast on it. A person could tell what the condition of the road was four or five hundred feet away, it is a gradual incline."

Mrs. Hutchinson testified:

"I couldn't tell the general condition of the gravel on that day. I didn't pay any attention. I knew it was rough. I had been over it previously and have been over it subsequent to that time. I can't describe the kind of ruts or roughness any more than it was just rough. There weren't any holes in the road to my knowledge."

The witness Adkins, who was a passenger in defendant's car, testified as a witness for plaintiff, and said:

"There was a hump right at the end of the paving and then there was a bunch of holes there. On further north it was about like any other gravel road I guess—good. These holes were off of that hump at the end of the pavement, just a bunch of chuck holes that were not very deep. The chuck holes were on further north just over the hump. Coming up as you approach the end of the pavement the graveled road appeared to be all right. It looked just like any ordinary graveled road and it surely is a much smoother change from paving to gravel than there are in many roads. Our car got over the little rise in the gravel there all right and that isn't what gave us any trouble. Just beyond that was a bunch of chuck holes. They were holes about an inch deep or two inches, and about six inches in diameter. Just little pockety places that had been dug out there. Cars bounce there. You couldn't see those holes as you come down toward the end of the pavement. When I looked and saw we were coming to the end of the gravel, I didn't see any holes. It looked like an ordinary graveled road."

One Bennett and one Saftner did not see the accident but reached the scene shortly afterward. Bennett testified:

1280

"I am familiar with the road from the end of the pavement to the Butterworth corner. There seems to be a little hump right in there toward the end of the pavement. From the end of the pavement north, the road has usually been a rough portion of graveled road and was rough through there that day. It is not a good piece of gravel road and you could observe that as you approach the end of the pavement. I don't recall the condition of the graveled road right at the end of the pavement. As you leave the end of the pavement and from there on north there is a little hump and a dip there. It seems to me it is a few feet off the end of the pavement that the hump starts. As you are driving north you hit a little hump and then you hit a raise and then you go off from that raise. From the point on the graveled portion where I have described this hump the road is rough as you continue north. There were some ruts in there. They weren't little. That is some distance after you get off from the end of the pavement. There were ruts and also chuck holes in that road. I don't know how deep the ruts or chuck holes were."

. Saftner said:

"As you come down past the sign, if I remember right, the grade is raised where the pavement is and this strip of graveled road is somewhat lower. When we left the pavement there was a slight dip and there was a little hump and then there was a larger dip there. The first one is a very slight dip, and then there is a hump there and a larger dip. As you pass over the hump and the larger dip it is rutty and rough up north further and right off the end of the pavement there was a little loose gravel. If a fellow was looking down the road he could tell it wasn't very good road. The road was pitted and deep like and makes the car bounce quite a bit when you drive over it even when a person is driving slow."

. The plaintiff himself made no mention of having seen any dangerous condition in the road as defendant's car approached the end of the pavement.

Of the seven witnesses who testified in behalf of plaintiff in regard to the condition of the graveled road, it will be noted that only three stated that the condition was such that it could be observed by one approaching the graveled road from the south. Of these three, the witness Jacobsen is the only one who states that there was any deep rut in the road or that the condition could be observed for any particular distance. In the face of this testimony

of plaintiff's witnesses as to the condition of the road, it seems hardly credible that there was such an obviously dangerous condition that the defendant must have seen it and realized its dangerous nature. Unless he did see it, or unless the signs which he passed were sufficient to apprise him of a dangerous condition there, it is difficult to see how he can be said to have proceeded without heed or concern for consequences or to have manifested a heedless disregard for or indifference to the rights of others.

Plaintiff contends, however, that, taking into consideration the two signs before reaching the graveled road and the obvious condition of the graveled road, in connection with the speed at which the defendant was driving, there is ample evidence to indicate that he was guilty of recklessness. Including the occupants of defendant's car, there were seven witnesses to this accident.

Of the witnesses who were in the car which was approaching on the graveled road from the north, the witness Grant testified:

"We had turned south and were about half way from the Butterworth corner to the end of the paving when I first saw the Martin car. It was close to quarter of a mile away and was coming over the brow of that little hill and we were then three or four blocks away from the end of the pavement. From the end of the pavement back to that sign is about 400 feet, that is close to the top of the brow of the hill where the sign is. I didn't notice the Martin car in particular as it came down the pavement. I saw it take this roll when it went off the end of the pavement and up to that time I hadn't observed the speed of the car at all. There was nothing to attract my attention to the car coming toward me until after it left the pavement. It is pretty hard to tell how fast it is coming when it comes toward you. It is my conclusion because the car turned the way it did it was being driven 50 or 60 miles per hour. All I know is that I saw it turn over twice and I base my estimate of speed on that."

Mrs. Jacobsen testified:

"I was driving the car as we were going south. I noticed the Martin car when it came over the little hill. I continued to watch the oncoming car and when it swerved to the west of the road, I put on our brakes. Before it left the paving and up to the time it approached the rough portion of the road, I didn't notice any evidence of its slackening its speed as far as I could observe. I was

watching my own car closely. From the way I observed it coming over the incline, I would judge it was going between 50 and 60 possibly. I didn't see anything unusual in the operation of that car until I saw it make a sharp swerve to the west or northwest. I was looking at the car all the time and I couldn't see that he slowed up, not as far as I could see, nothing more than he was driving right along and coming toward us."

Mr. Jacobsen testified:

"My attention was not attracted by any oncoming car until after we got about half way down on that graveled road between the end of the pavement and that corner. The first I noticed it was when it started swaying around. It must have been just around the end of the pavement. They were driving on the right hand side of the road, I imagine, and they came off, that is what attracted my attention when it first got out of that straight line it was coming in. It turned over twice and then the last time it smashed down on the top and when it turned over it left those three men in the road. The car made one big sway to the west then went to the other side a little bit but not very much and when it made this big sway to the left is when it turned over. In my judgment the speed it was traveling when I first observed it was about sixty miles an hour, maybe faster. I don't know. I judge the Martin car was about the end of the pavement when I first saw it and our car was about halfway down from the corner. It just looked like it skidded to me, I don't know. I really don't know how fast it was going."

Mrs. Hutchinson gave no estimate of the speed at which the Martin car was traveling.

The witness Adkins, who was a passenger in the back seat of the Martin car, testified:

"Before Mr. Martin slowed down before reaching the end of the pavement, we were going somewhere between 40 and 50 miles per hour and on perfectly level road. Mr. Martin had slowed down before he got to the end of the pavement and from the time he got there and the car started to swerve he was trying to right it. He had reduced his speed to about 35 miles per hour at the time he got off the end of the pavement."

Mr. Brown, the plaintiff, testified:

"As we went north out of Fort Dodge and while traveling upon the paved road, Mr. Martin was driving 45 and 50 miles per hour. A mile or mile and a half from the end of the pavement two men or boys passed us on this pavement and Mr. Martin says, 'What do you know about that? We are going 50 miles an hour'. That is all the way I've got of knowing about the speed. I didn't look at the speedometer; I didn't think anything about it. I observed the words of the sign 'End of Pavement'. I don't remember whether I read it first or Mr. Adkins, but whichever read it first, the other one repeated it after him, this being a railroad custom among us fellows in reading signals. I think I said that loud enough so Mr. Martin could hear me. I couldn't notice that Mr. Martin had decreased his speed any from what it was back where the other car had passed him. I don't think Mr. Martin slackened his speed after we read the sign to him. Just as we came down to the end of that pavement Mr. Martin said, like he was talking to himself, he says 'Whoop' and the car slackened up and slowed down. The brakes were applied when he said 'Whoop'. The time he applied the brakes the car was right at the end of the pavement. He set the brakes and slowed his car down a little and then we hit this rough track or rough road and the car commenced to jump or twist and then I don't know any more."

Of the four witnesses who were in the Jacobsen car, only three gave any estimate of the speed at which the Martin car was traveling. The testimony of two of these witnesses, Mr. Grant and Mr. Jacobsen, plainly shows that they did not see this car before it started to swerve or until just about the time it turned over. It is quite apparent from their testimony that they based their estimate of speed solely upon the way the car turned over and the distance from where it first turned over to where it finally came to a stop in the ditch. Mrs. Jacobsen, it is true, testified that she watched the Martin car from the time it came over the brow of the incline, and that it did not appear to her that it slackened its speed at any time after it left the end of the pavement. It must be recalled, however, that Mrs. Jacobsen was driving her own car, that she says she was paying close attention to it, and that, when the Martin car finally stopped, the Jacobsen car was, according to the testimony of these witnesses, somewhere between two blocks and a quarter of a mile north of it. Under these circumstances, the estimate of speed given by any of these witnesses is of very little, if any, value. The wit-

ness, Adkins, on the other hand, being a passenger in defendant's car, was in a position to estimate its speed. He testified that the car did slow down and that at the time it reached the end of the pavement its speed was about 35 miles per hour.

It is true that the plaintiff, Brown, testified that the defendant's car did not slacken its speed until it got near to the end of the pavement. He also stated, however, that the remark made by Martin when about a mile or a mile and a half back from the end of the pavement, when another car passed him, and he said, "What do you know about that? We are going 50 miles an hour", was the only way he had of knowing about the speed; that he did not look at the speedometer and did not think anything about it. He also stated that he did not know how slow Martin had got the car at the end of the pavement. The defendant, Martin, testified that, when the other car passed him, he was driving about 50 miles an hour; that after that car passed he changed his speed right about the crest of the little rise; that before he came to the "Pavement Ends" sign he was traveling about 40 miles an hour; and that he slowed down between the sign and the end of the pavement and was traveling not to exceed 30 miles an hour when he reached the end of the pavement. It is quite apparent that the estimates of the speed of the Martin car given by the occupants of the Jacobsen car were based upon the distance between where the Martin car first turned over and where it came to a stop, and not upon any actual observation of its speed. It must be remembered, however, that speed is not the only element which would enter into the distance which this car covered between the time it first turned over and the time it came to a stop. The weight and size of the car and the extent of the down grade would also be very important factors. It does not appear that any of these witnesses took these matters into consideration, and, even if they did so, there is no showing as to their competency to reach correct conclusions and give their opinions as to speed based upon any or all of these considerations. It is quite apparent that, under the circumstances, the estimates of speed given by these witnesses can be nothing more than pure speculation. There is no substantial basis upon which any of these witnesses could say that the Martin car would not have turned over as it did and gone the distance which it did before coming to a stop, even if it had not been traveling more than 30 miles per hour. It must be recalled,

further, that any rate of speed in and of itself is not negligence, much less recklessness.

In our opinion the presence of the road signs, the evidence as to the condition of the graveled road, and the evidence as to the speed at which the Martin car was traveling, are not sufficient to establish that the defendant, Martin, was guilty of recklessness. Moreover, the positive and undisputed evidence that the defendant did apply his brakes and slow down his car and that he tried to right it after it began to swerve, negative any such attitude on his part as would necessarily exist if he had acted recklessly, without any care, and with heedless disregard of consequences and the rights of others. Adkins, who, as we have already seen, was a passenger in defendant's car and one of plaintiff's witnesses, testified that as they approached the end of the pavement some one said "Whoa" and the car slowed down; that at the time they reached the end of the pavement it was traveling around 35 miles an hour; that when they went off the end of the pavement and over a kind of ridge there or graveled hump "the car jumped and shot to the right and Mr. Martin pulled it back and it shot to the left, and he pulled her back and she went over." The plaintiff, Brown, was in the front seat with the defendant, Martin, and, if there was any obviously dangerous condition of the graveled road ahead of him, he was in a position to see it as well as the defendant. He makes no claim of having seen such dangerous condition of road, however, and does not testify to a single act on the part of Martin which he considered as indicating recklessness. On the contrary he stated that he had frequently ridden with the defendant; that the defendant always appeared to be a good careful driver; that on this very trip, so far as he knew, the defendant had done fine; that up to the time of the accident everything seemed to be all right, and there was not a thing went wrong; that when they reached the end of the pavement the defendant said, "Whoop", applied his brakes, and slowed down the car; and that as the car was slowing down it hit something.

. At the time of this accident the plaintiff was 67 years of age and the defendant 65 years of age. They were both engaged in the occupation of passenger engineers on limited trains upon a great railway system, and were habitually accustomed to exercising a high degree of care. If there had been anything in the conduct of the defendant to indicate an utter want of care or disposition to disregard consequences in the face of danger, it is hardly possible that

the plaintiff would not have become aware of it. Even if it may be said that the defendant should have reduced the speed of his car more than he did before going upon the graveled highway, there is nothing to show his failure to do so amounted to anything more than an error in judgment, and, regardless of the consequences, a mere error in judgment amounts to no more than negligence and is not recklessness. Much stress is placed by the appellee on the number of times the car turned over, the distance between the place where it first turned over and the place where it finally stopped, and the way in which the occupants of the car were thrown out through the top as the car turned over. These matters, however, in no way establish such conduct on the part of the defendant as is necessary to constitute recklessness. As said in Neessen v. Armstrong, supra:

"The mind is prone to look upon the result, but; unless the acts of the defendant would have been reckless within the meaning of the law without the resulting injury to Neessen, they are not reckless merely because Neessen lost his life. Our statute, section 5026-b1, Code 1931, was enacted for the very purpose of preventing recovery by a guest of damages resulting from the negligence of the driver of the automobile."

We believe that the evidence in this case was insufficient upon which to base a verdict of recklessness, and that the motion for a directed verdict in behalf of the defendant should have been sustained.

In view of the decision reached, we deem it unnecessary to consider the many other grounds for reversal set out by defendant. —Reversed.

KINDIG, C. J., and EVANS, ALBERT, and ANDERSON, JJ., concur.

KINTZINGER, MITCHELL, and STEVENS, JJ., dissent.