RONALD H. HARTMAN, a minor, by ALFRED HARTMAN, his father, appellee, v. WENDELL KRUSE et al., appellants.

No. 49470.

(Reported in 91 N.W.2d 688)

JULY 28, 1958.

REHEARING DENIED SEPTEMBER 19, 1958.

Murray & Murray, of Sheldon, and Roseberry & Down, of Le Mars, for appellants.

Orville A. Hames, of Remsen, and Thomas L. McCullough, of Sac City, for appellee.

WENNERSTRUM, J.—Plaintiff, a minor, in an action brought in his behalf by his father, sought recovery under the guest statute for personal injuries received in an automobile accident. It occurred at night at a T intersection of a gravel country road and a blacktop, numbered highway. Defendants' motions for a directed verdict were overruled and upon submission of the cause to the jury a verdict was returned against them. Later defendants' motions for judgment notwithstanding the verdict and for new trial were overruled. They have appealed.

Ronald H. Hartman, the plaintiff, was 17 years of age at the time of the accident which occurred on April 2, 1956. He and defendant Wendell Kruse lived with their respective parents on near-by farms in Plymouth County, Iowa. They are related by marriage.

The plaintiff had attended a national guard drill at Le Mars on the evening of the accident. Later the young men went to the plaintiff's home. Defendant Wendell Kruse was driving his father's car. Shortly after ten o'clock p.m. they left the Hartman home in the Kruse car to attend a dance at Akron, approximately 12 miles away. They drove west over a gravel hilly road to where the accident occurred some ten miles from the Hartman home. The Kruse boy when he observed the nature

of the intersection he was approaching endeavored to turn and guide the car so as to avoid striking a railroad embankment and a telephone pole across the road to the west. The car rolled over once as it skidded into the ditch and landed on its wheels. Both boys were thrown out on the right-hand side.

Inasmuch as the plaintiff contends the Kruse boy was driving the car in a reckless manner at the time of the accident and over the road they had traveled we deem it advisable to relate the testimony concerning the manner in which the car was driven from the time it left the Hartman farm until it entered the T intersection. Two of several intervening north-and-south roads between the Hartman home and Highway No. 12 where the accident occurred were marked with stop signs. The first intervening road which had a stop sign was about one and one-half miles west of the Hartman home, and is known as Highway No. 29. The second road which had a stop sign was about one and six-tenths miles east of the place of the accident. There is testimony by the plaintiff the Kruse boy stopped his car at the first stop sign. He also testified defendant Wendell Kruse increased his speed after crossing the highway last referred to and he observed the speedometer indicated a speed of 85 miles per hour when they reached a bridge about five and one-half miles from the Hartman home and about four and one-half miles from the place of the accident. This rate of speed is denied by the defendant but under our established holdings we are to consider the testimony of the plaintiff in the light most favorable to him in considering a motion for a directed verdict. There is testimony on the part of the plaintiff he asked the defendant to slow down, that the defendant laughed and said: " 'I know how to drive this car.' " He also testified Wendell said he was going to overhaul the car in two weeks and he did not care if he did " 'drive the heck out of it.' " These statements were made approximately four and one-half miles east of where the accident took place.

There is a hill about a quarter of a mile from the T intersection on Highway No. 12 where the accident occurred. There is a stop sign at this road. The defendant driver testified he first observed the stop sign after the car had leveled off at the bottom of the hill and the lights of his car illuminated it. He

was then about 100 feet away from the sign and he then put on his brakes. The plaintiff twice gave testimony the defendant "slammed on his brakes." The car skidded on into the intersection and continued another 62 feet to the west shoulder of Highway No. 12. It then rolled over. When the car came to rest, Wendell, the driver, was lying on the ground about three feet from the car and the plaintiff was about ten feet from it.

The plaintiff, in his amended and substituted petition, based his claim on recklessness, in the main upon the claimed dangerous rate of speed the car was driven by defendant Wendell Kruse at and prior to the time of the accident, and alleged the automobile was driven at a speed of between 80 and 85 miles an hour to a point where the road on which the defendant was driving ended. It is further alleged that the driver of the car failed to have the automobile under control when he drove into the T intersection previously mentioned.

In connection with these allegations of the petition it should be noted the plaintiff did not testify as to any particular rate of speed after the occupants of the car had passed the bridge some four and a half miles east of Highway No. 12. The only testimony given by the plaintiff relative to the movement of the car after it passed the bridge is as follows:

"* * * Then we came to this next stop sign. Wendell just slammed on his brakes. He didn't stop. He just slammed it in second and went right on across. * * * After Wendell Kruse passed this second stop sign I said 'Wendell, we should have stopped at this stop sign.' He just said, 'Yeah, I guess so', and just took right off and kept right on going. After that point the road was still hilly.

"Q. What happened after that, if anything? A. Well, I was scared. I didn't know what to do. And he came over this last hill and as the car started to go down I shut my eyes because I didn't know what to do. The next thing I knew he hit his brakes. Q. Did you have your eyes closed at the time that he hit his brakes? A. No. I opened them up and there was the black-top right ahead of us. Q. Well, what if anything did you see at that point. A. As soon as I seen the blacktop I blacked right out."

■ I. The initial question for our determination is whether the facts heretofore set forth generate a jury question relative to the claimed recklessness of the defendant driver. We have set out such parts of the plaintiff's testimony which, interpreted in the light most favorable to him, must be considered in determining whether it discloses "* * * a situation from which reasonable men might draw an inference of 'no care, coupled with disregard for consequences'." Anderson v. Elliott, 244 Iowa 670, 677, 57 N.W.2d 792, 795. We have said, "The evidence must disclose something from which recklessness could be legitimately inferred, * * *." Wilde v. Griffel, 214 Iowa 1177, 1180, 243 N.W. 159, 160; Goetsch v. Matheson, 246 Iowa 800, 806, 68 N.W.2d 77.

However, in order that the action and conduct of the driver of a car can be classified as reckless "* * * it must be such as to manifest a heedless disregard or indifference to the rights of others; * * *." Wilde v. Griffel, supra. We have also held in order to show recklessness there must be evidence of (1) "no care, coupled with disregard for consequences," (2) there must be evidence a driver "* * * had actual knowledge of an existing danger, or there was a danger so obvious that he should be cognizant of it, and proceeded without any heed of or concern for the consequences", and (3) "* * * the consequences of the actions of the driver are such that the occurrence of the catastrophe is a probability rather than a possibility." Fritz v. Wohler, 247 Iowa 1039, 1041, 78 N.W.2d 27, 28, and cases cited.

■ II. As heretofore shown the defendant driver failed to stop at the intersecting road and stop sign approximately one and six-tenths miles from the road where the accident occurred. It was after the car had passed this stop sign the plaintiff made the remark previously quoted and the defendant replied as heretofore set out. We do not believe the statement of the plaintiff can be interpreted as amounting to a protest or a complaint relative to an excessive rate of speed. Neither can we interpret the reply of the defendant driver as indicating a mental attitude of indifference to and a complete disregard for consequences.

In Goodman v. Gonse, 247 Iowa 1091, 1096, 76 N.W.2d 873, 876, the plaintiff introduced testimony that shortly before the accident there considered, one of the occupants of the car said

to the driver he was "driving too fast" and in reply the driver said: " 'Shut your mouth, I don't like back seat drivers, you can get up here and drive.' " We made no extensive comment about these remarks in the opinion but upon all the evidence in the plaintiff's case we held there was not sufficient showing from which an inference of recklessness might be drawn.

 III. We should also consider whether there is evidence of "no care, coupled with disregard for consequences." In the present case there is undenied evidence the defendant driver, as soon as he observed the stop sign at the Highway No. 12 T intersection put on the brakes of his car. It was then 100 feet from the stop sign. From this point it skidded into the intersection and then proceeded another 62 feet to the west shoulder of Highway No. 12 and rolled over. As the car skidded into the highway the defendant driver, according to his testimony, "* * * thought I had better straighten it out and it kept going. Then I thought, well, there is a telephone pole straight ahead and a big embankment—a low embankment, but I didn't want to hit that so I tried to turn to the left."

. We are unable to conclude the driver's actions showed "* * * acts utterly inconsistent with prudence or proper regard for the safety of the guest in his car, from which the inference could be drawn that the operation of the vehicle was reckless." Goodman v. Gonse, supra, 247 Iowa 1091, 1099, 76 N.W.2d 873, 877, 878; Wilde v. Griffel, supra, 214 Iowa 1177, 1179, 243 N.W. 159. In the instant case, as in the Wilde case, there is no evidence the driver did not do everything in his power to avoid the accident.

IV. We should determine whether the defendant driver "* * * had actual knowledge of an existing danger * * *" and then proceeded "without any heed of or concern for the consequences."

It is true there is testimony by the plaintiff that Wendell had been over the road traveled. The defendant testified he had not driven over the road but had ridden over it a couple of nights before. Relative to knowledge of the nature of the intersection at Highway No. 12 the defendant driver testified:

"* * * Then after this second stop sign I slowed down to

about 45 because I kind of thought there was a dead end—I thought there was a dead end ahead and I was looking for a sign of some kind to tell me that there was a dead end. I didn't know exactly how far it was from the second stop sign to the dead end of the road. I thought it was at least two miles or more. I expected there would be some sign when I got there to tell it was a dead end. There is a stop sign at the north-and-south highway that is about a mile and a half or a mile and six tenths east of Highway No. 12 where the accident took place. That intersecting road was a gravel road. After I reached that road that is approximately a mile and a half east of Highway No. 12, I drove the car westward toward Highway No. 12 at about 45 miles an hour."

There is no other evidence of Wendell's knowledge relative to the "dead-end" intersection. We have held where the driver does not have conscious knowledge that a road ends at a T intersection one is not guilty of recklessness in not observing the character of the intersection in time. Tucker v. Heaverlo, 249 Iowa 197, 202, 86 N.W.2d 353, 356; Wilde v. Griffel, supra; Tomasek v. Lynch, 233 Iowa 662, 10 N.W.2d 3.

As shown by the quoted testimony the defendant driver had knowledge he was approaching a T intersection but he did not know just where it was. When he did observe the stop sign and road he put on the brakes and sought to turn the car and avoid hitting the embankment across the road. It is our considered conclusion the defendant driver did everything he could to avoid the accident and that he did not proceed "without any heed of or concern for the consequences."

In Tucker v. Heaverlo, supra, we held where the driver put on the brakes approximately twenty-five feet from a ditch "* * * it does indicate an effort to stop the automobile as soon as the driver became aware of the apparent danger." In Tomasek v. Lynch, supra, there is evidence the car skidded for 20 feet before it went over an embankment. In each of the last two cited cases this court held there was not sufficient evidence of recklessness to justify submitting that question to the jury. In the present case the brakes were put on approximately 162 feet from the ditch. It may be true the driver then tried to straighten up the

car when it began to skid but he was endeavoring to control and stop it. He also endeavored to turn it to the left. All these acts, it is our conclusion, do not indicate a lack of or unconcern for consequences.

Other cases where this court has held there was not sufficient evidence of recklessness to justify submitting that question to a jury, where the driver of a car sought to stop and control it, are: Brown v. Martin, 216 Iowa 1272, 1285, 248 N.W. 368; Scott v. Hansen, 228 Iowa 37, 44, 46, 289 N.W. 710; Schmitt v. Cutkomp, 248 Iowa 575, 581, 81 N.W.2d 662, 665.

■ It is when a driver has conscious knowledge of a dangerous situation and then does not exercise the slightest care to avoid injury to his guest that recklessness is shown. Roberts v. Koons, 230 Iowa 92, 296 N.W. 811; Peter v. Thomas, 231 Iowa 985, 2 N.W.2d 643; Long v. Pearce, 233 Iowa 1025, 10 N.W.2d 50. Such is not the situation in the present case.

V. Upon a review of the evidence heretofore set out, as well as all the evidence disclosed by the record, we are unable to conclude "* * * the consequences of the actions of the driver are such that the occurrence of the catastrophe is a probability rather than a possibility." There is nothing to indicate the action of the driver, in the light of what he endeavored to do, showed there was a probability of a catastrophe rather than a possibility.

■ VI. The plaintiff's testimony concerning the speed of 85 miles per hour was when the car was at or near the bridge approximately four and a half miles from Highway No. 12, the intersecting road. In the light of the comment in the dissenting opinion relative to speed it can again be stated there is no reference to the probable speed of the car just before the accident except as previously stated. It is true the plaintiff made a statement regarding the speed of the car during the last quarter of a mile before reaching the intersecting road when he testified: "I knew the car was going at a fast rate of speed." This, however, is a comparative term. It does not indicate a particular mileage per hour. And it was then, or shortly thereafter when, according to the plaintiff's own statement, "The next thing I knew he hit his brakes." Speed in itself does not amount to recklessness. Thornbury v. Maley, 242 Iowa 70, 74,

45 N.W.2d 576, and cases cited. And as stated in the Maley case the question whether a particular speed is dangerous depends upon the surroundings and the attendant circumstances. A fact to be considered is the effort of the defendant to stop his car, which is substantiated by the plaintiff's statement previously quoted. And as heretofore set out in another division of this opinion we have held even when a driver has conscious knowledge of a dangerous situation recklessness is shown only when the driver does not exercise the slightest care to avoid injury to his guest. Upon the plaintiff's own version of the situation immediately prior to the accident there is no evidence the defendant did not exercise the slightest care.

VII. In Shenkle v. Mains, 216 Iowa 1324, 1328, 247 N.W. 635, 637, we commented on the exceptional grounds upon which a plaintiff might recover in a recklessness case as follows: "* * * The general rule is that a guest cannot recover. The exceptional grounds are: (1) 'intoxication' of the driver, (2) 'reckless operation' by the driver. The exceptional character of these grounds implies an infrequency of application thereof. To use and apply the exceptions as the general rule, and in effect to supplant the general rule with the constant use of the exceptions, is to drive against a red light. If the application of the exceptions becomes more frequent than that of the general rule, it may well be deemed a warning sign that we are misapplying the exceptions." The foregoing statement has application in the instant case.

We have concluded the defendant's motion for a directed verdict at the close of all the evidence should have been sustained. Inasmuch as the motion heretofore mentioned was overruled, the subsequent motion for judgment notwithstanding the verdict should have been approved. It is very apparent the plaintiff presented all the evidence obtainable and it is hardly possible additional witnesses or testimony could be secured if the case is retried. Under rule 349, R. C. P., we may enter or direct the trial court to enter a final judgment. It is our conclusion the trial court should do so. Schneider v. Parish, 242 Iowa 1147, 1155, 49 N.W.2d 535, 540.

The judgment entered against the defendants by reason of the verdict returned is reversed and remanded and it is directed

1330

a judgment should be entered in favor of the defendants and against the plaintiff for costs.—Reversed and remanded with directions.

BLISS, HAYS, THOMPSON, LARSON, and PETERSON, JJ., concur.

OLIVER, J., and GARFIELD, C. J., dissent.

OLIVER, J. (dissenting)—I respectfully dissent.

Not only does the majority opinion misinterpret legal propositions involved in this case but it also overlooks important facts which, if considered, would require the conclusion that the trial court did not err in overruling defendants' motions for directed verdict and for judgment notwithstanding the verdict. The majority tells us there is a rule of law that in passing upon such motions, "we are to consider the testimony of the plaintiff in the light most favorable to him.". The correct rule, I understand, is that for such purpose, not only the testimony of plaintiff, but also all other evidence, should be considered in the light most favorable to plaintiff. However, the serious error here is not that the majority mistakes the rule but that it fails to consider the evidence in the light required by such rule, overlooks evidence favorable to plaintiff, considers evidence in the light most favorable to defendant and usurps the province of the jury by passing upon the weight of evidence.

April 2, 1956, plaintiff, Ronald Hartman, lived on a farm two miles north and about ten miles east of Akron. Wendell Kruse, for convenience referred to herein as the defendant, lived a short distance farther east. Defendant's age, not shown in the majority opinion, was then seventeen years. At 10:15 p. m. the two boys left plaintiff's home in the 1954 Chevrolet automobile of defendant's father, driven by defendant, to attend a dance at Akron. The lights and brakes of the automobile were good. The boys were late in starting to the dance which began about 8 p. m. and ended about 11:30. En route to Akron plaintiff was thrown out of the car and injured when it left the road and overturned at a dead-end intersection.

About two miles west of plaintiff's home Highway No. 29 ran north and south. Eight miles farther west was Highway

No. 12 which also ran in a general north-south direction. Both of these highways were hard surfaced, blacktop. Two of the roads running west from 29, both of which defendant had previously traveled, came to dead ends at Highway No. 12 eight miles west of Highway No. 29. On the night of April 1 defendant had driven plaintiff to Akron. On that occasion defendant had traveled south on Highway No. 12 for several miles before turning west to Akron. This third route was blacktop and was the best route to Akron. However, it was two miles longer than the two other routes, each of which ran west from Highway No. 29 to Highway No. 12, where each came to a dead end, from which places travelers could take Highway No. 12 south to Akron.

En route to Akron, on the night of April 2, defendant drove west from plaintiff's home to and across Highway No. 29 and continued west on the gravel road toward Highway No. 12. Plaintiff asked him why they were taking this road, and said they should take the blacktop. Defendant answered that he knew this road, had driven it before and had been over it just two nights before and knew it was a good road. Plaintiff was not familiar with it. Concerning this road a witness testified: "It is approximately eight miles between 29 and 12. There are some awful steep hills running about three to four hills per mile." In this eight-mile stretch there are eight roads intersecting this gravel road, "all blind intersections, that is, they meet on top of a hill. A quarter of a mile east of where this gravel road intersects or dead ends with Highway No. 12, there is a hill."

After defendant told plaintiff he knew the road, he "just took off" on the gravel road at a speed of 60 or 65 miles per hour. It was a cloudy night. When they had traveled several miles plaintiff "noticed he was pushing it harder and I was starting to get pretty scared." At the bottom of a hill they came to a bridge which "the car really weaved over. I was so scared I didn't know what to do. I * * * noticed the speedometer said 85. So I said to Wendell, 'We had better slow down a little bit. The way we are riding it is like going on a rollie coaster.' He just laughed and said, 'I know how to drive this car * * * and I don't care if I do drive the heck out of it.' By that time I

**1332**

was really scared and he didn't slow down a bit, so I felt the best thing to do was to be quiet, not to say anything, because it wouldn't do no good." Plaintiff testified defendant did not slow down as he crossed the various blind intersections where there were no stop signs. On this point defendant testified, "Well, I'd say some that I seen in time that I did, yes." They came to the second stop sign, 1.6 miles from the place of the accident. Defendant slammed on his brakes, threw the car into second gear and went right on across. Plaintiff said they should have stopped. Defendant answered, " 'Yeah, I guess so', and just took right off and kept right on going. After that point the road was still hilly. * * * Well, I was scared. I didn't know what to do."

As they started down the west slope of the last hill, a quarter of a mile from Highway No. 12, "I shut my eyes because I didn't know what to do. * * *I opened them up and there was the blacktop [Highway No. 12] right ahead of us. * * * I knew the car was going at a fast rate of speed." Defendant testified he applied the brakes to the automobile 100 feet east of the stop sign. This stop sign was 62 feet east of the west shoulder of the highway. The majority opinion states the car skidded 162 feet to the west shoulder of the highway. However, after it reached the shoulder of the highway it plunged into the ditch, rolled over and stopped right side up 50 to 75 feet south of the intersection. Defendant testified, "Ronald and I both flew out of the car through the [right] door on Ronald's side." Plaintiff's slipper-type shoes and his jacket were torn from his body. He suffered serious injuries.

I. In its statement of facts the majority opinion sets out what it states is: *"The only testimony given by the plaintiff relative to the movement of the car after it passed the bridge."* Reference has already been made to the testimony of both parties that defendant did not reduce the speed of the car as it crossed blind intersections with crossroads. There was also the following testimony of plaintiff on cross-examination, already referred to herein. "For the quarter of a mile from the top of the hill until just before we got to No. 12 my eyes were closed. Q. And you weren't paying any attention to how the car was going or what

was being done in the car? A. I knew the car was going at a fast rate of speed. * * * We skidded way across Highway No. 12."

The statement in the majority opinion that it had set out *"The only testimony"* of plaintiff *"relative to the movement of the car after it passed the bridge"* overlooks the testimony just quoted. The majority opinion is based in part upon its assumption that there was no testimony save that of defendant, concerning the movement of the car immediately prior to the accident. Plaintiff's testimony that it was then going at a fast rate of speed is contrary to this assumption.

II. Two witnesses testified they traveled in an automobile over the road in question at night when the conditions of the road, light and weather were the same as at the time of the accident. It will be remembered an automobile traveling west on the gravel road comes over the crest of a hill a quarter of a mile east of the dead end. One witness testified:

"As you come over the hill your lights come right down onto the blacktop. There is a big black post and a long embankment and a stop sign, but you can't read the stop sign until you get halfway down the hill when your lights come back up. You could see the telephone pole and embankment and the road at the top of the hill. As you get down the slope your car levels off and you can see the whole road, stop sign and all. As you go down the hill you cannot see the dead end or embankment for a second or two, but after you get down to the bottom of the hill and level out, the embankment, telephone pole and blacktop road and stop sign become visible. Last night I measured the distance from the bottom of the hill at which you could see these objects, the embankment, stop sign, and so forth.

"Q.—there is a point there at which your lights can shine down and your lights don't shine out onto the stop sign and on this road embankment, is that right, sir? A. Yes. Within about 1200 feet she comes back up and you can see everything."

The other witness testified: "The car was being driven at a speed of about fifty. * * * You could see the light on the sign when you came over the hill. Then as you go down the hill, you couldn't see. When you got to the foot, you could see it again then plain, the stop sign. * * * 420 feet back."

According to this testimony the big black post, long embankment and stop sign at the dead end become visible at night to the driver of an approaching automobile at the top of the hill one-quarter mile east of the dead end, are lost to view for a short distance, but come into full view at a distance of 1200 feet and are very plain from the bottom of the hill about 420 feet east of the stop sign. The majority opinion entirely overlooks the testimony of these two witnesses and proceeds on the theory there is no such evidence.

Defendant testified: "After I leveled out, my lights would shine on that stop sign [420 feet distant] * * * I'd say I was about 100 feet from the stop sign when I first saw it."

Nevertheless, the majority opinion views the testimony upon this phase of the case in the light most favorable to defendant, stating in Division III: "In the present case there is undenied evidence the defendant driver, as soon as he observed the stop sign at the Highway No. 12 T intersection put on the brakes of his car. It was then 100 feet from the stop sign."

Of course, no witness could deny defendant's testimony that he applied the brakes as soon as he observed the stop sign or that he first saw it when it was 100 feet distant. However, the jury was not required to believe that testimony.

In Anderson v. Elliott, 244 Iowa 670, 676, 57 N.W.2d 792, 795, the court, in disposing of a similar matter, stated: "There is of course no one except Elliott who knows his real intention, but we think the jury was not bound to accept his version."

There is a rule, too well established to require the citation of authorities, that, under conditions comparable to those here shown, one may not be heard to say he did not see that which was in plain sight before him. Hence, the majority statement, that the evidence was "undenied" that defendant put on the brakes as soon as he saw the stop sign, is incorrect from a legal standpoint. The testimony of other witnesses was sufficient to support a finding by the jury that defendant saw the dead end which his car was approaching when he was one-fourth mile east thereof, that he saw it again plainly when he was 1200 feet east thereof and thereafter until his car sped past it, and that the letters on the stop sign were plainly visible to defendant when he reached the foot of the hill 420 feet east of such stop sign.

III. Division IV of the majority opinion quotes at length from the testimony of defendant, which it views in the light most favorable to defendant, and concludes the record establishes that defendant, who knew he was approaching the T intersection, did not know just where it was.

Defendant testified he thought there was a dead end ahead and was looking for a dead-end sign. However, the jury was not required to believe his story that he was driving at a reduced speed and keeping a conscious lookout for such a highway sign. If he were keeping such lookout his failure to see the stop sign and intersection until long after these had come into his view would be difficult to understand. The jury had the right to believe plaintiff's testimony that after defendant "ran" the stop sign at the crossroad 1.6 miles east of the T intersection he "took right off and kept right on going" and as he approached the T intersection "the car was going at a fast rate of speed." The weight to be given this testimony was for the jury to determine and this court may not properly pass upon it.

IV. In Division III the majority opinion states that as soon as defendant saw the stop sign at the T intersection he put on the brakes and as the car skidded 100 feet into the intersection he tried to turn to the left to avoid the telephone pole and embankment. The opinion then appears to hold "there is no evidence the driver did not do everything in his power to avoid the accident" and hence no "inference could be drawn that the operation of the vehicle was reckless."

That proposition was considered in the much cited case of Mescher v. Brogan, 223 Iowa 573, 578, 272 N.W. 645, in which the driver was operating the automobile over a wide, well-settled gravel highway, with which he was unfamiliar, at a speed of 65 miles per hour at night and was unable to negotiate a turn:

"There is nothing in the testimony to indicate that the driver did not exercise all the care possible to avoid injury after he discovered the corner or turn in the road. In other words, there is no evidence of recklessness, or even want of care, in the operation of the car from the moment the defendant discovered that he could not make the turn in safety. The recklessness, if any, consists in the high rate of speed at night with visibility limited, coupled with his apparent attitude of indifference to

consequences and to the rights of the other occupants of the car, most of whom, according to the evidence, were plainly indicating that they were frightened at the speed he was traveling at night over a gravel highway, which was not marked, when the driver knew, or in the exercise of ordinary care should have known, that he might come upon a turn or sudden curve in the road. We think the evidence presents a case, not of one driving in the face of apparent danger, but a danger reasonably to be anticipated by a person exercising ordinary prudence and caution under the circumstances, and that under all the facts and circumstances, it was for the jury to determine, and not a case presenting facts upon which minds of reasonable men might not differ as to whether the conduct of the defendant came within the definition of recklessness, as defined by this court, as hereinbefore set forth."

Moreover the case at bar is stronger than Mescher v. Brogan, supra, in which the driver was not familiar with the road and the turn was not marked, in that here the evidence was sufficient to support a finding of fact that defendant was familiar with the dead-end intersection, which was marked by a stop sign, was looking for it and saw it a quarter of a mile before he drove through it and that he did not attempt to slacken the speed of his car until (according to his testimony) it was only 100 feet from the stop sign and, according to plaintiff's testimony, not until the intersection was "right ahead of us."

V. Division II of the majority opinion refers to a statement by plaintiff, "Wendell, we should have stopped at this stop sign", and the answer, "Yeah, I guess so." The majority opinion then states: "We do not believe the statement of the plaintiff can be interpreted as amounting to a protest or a complaint relative to an excessive rate of speed. Neither can we interpret the reply of the defendant driver as indicating a mental attitude of indifference to and a complete disregard for consequences." Here, again, the majority selects a part of the record only, and finds that this statement did not amount "to a protest or a complaint relative to an excessive rate of speed", and that the reply did not indicate "a mental attitude of indifference to and a complete disregard for consequences."

If such a finding had been proper and was deemed necessary to bolster the majority opinion, it should have been based upon all pertinent statements of the parties, shown in the record. Obviously, the consideration of only one statement and one answer would not be sufficient. However, when the whole record is considered, it clearly appears that plaintiff was protesting and complaining about the excessive rate of speed at which defendant was driving.

I quote from plaintiff's cross-examination: "Q. But you were complaining about his speed? A. Yes. * * * Q. And the only objection—the only protest that you say you made was about the speed he was driving? A. Yes, and at the time he got a little too far over on the shoulder and it started to weave. Q. And you protested and told him about that, did you? A. Yes."

Plaintiff had already testified on direct examination: "I * * * noticed the speedometer said 85. So I said to Wendell, 'We had better slow down a little bit. The way we are riding it is like going on a rollie coaster.' He just laughed and said, 'I know how to drive this car * * * and I don't care if I do drive the heck out of it.' * * * He didn't slow down a bit."

Plaintiff's testimony that he protested and complained about the speed of 85 miles per hour was sufficient to support a finding of the jury to that effect. It was not necessary that his testimony concerning such protests or complaints be corroborated. In other words, testimony of a person that he protested and complained about speed is some evidence he protested and complained about speed. The holding by the majority opinion is tantamount to a finding this testimony of plaintiff was not worthy of belief and was entitled to no weight. There is no basis for such holding. Moreover, such holding is a usurpation of the function of the jury.

What has just been said is applicable also to the finding of fact by the majority opinion that defendant's laughter and reply did not indicate a mental attitude of indifference to and a complete disregard for consequences. This finding exemplifies the method employed by the majority of deciding the appeal upon fragments of the record deemed favorable to defendant. Whether there was evidence of "a mental attitude of indifference", etc.,

need not depend wholly upon what defendant said. In determining such attitude the jury properly could have considered also his wild, eight-mile race in the darkness, along this gravel road, up and down very steep hills, through blind intersections at 85 miles per hour, and through stop signs, plus his failure to safely approach the dead-end intersection for which he testified he was consciously looking, and which was visible a quarter of a mile away.

The procedure adopted by the majority in singling out and disposing separately of various propositions is not proper in a guest case involving recklessness. Such cases are usually based upon proof of a combination of circumstances regarded as sufficient to show recklessness. Plaintiff is entitled to have all the pertinent acts and conduct of defendant considered together rather than piecemeal as the majority opinion has done.

In the language of Hahn v. Strubel, 243 Iowa 438, 446, 448, 52 N.W.2d 28, 33, "we must consider the whole affair as it happened that night. * * *:

"While it may be assumed that standing alone single instances above set forth would not necessarily constitute recklessness, yet we think that when taken as a whole they fit into a pattern which would justify a finding that the defendant at the time in question was reckless within the meaning of the guest statute. Under the record we hold that it was for the jury to pass upon the question as to whether or not defendant was reckless as alleged by plaintiff."

VI. In Division IV the majority opinion states: "We should determine whether the defendant driver '* * * had actual knowledge of an existing danger * * *' and then proceeded 'without any heed of or concern for the consequences.'" Again the majority would usurp the function of the jury. The question is not what we should determine. It is whether there was substantial evidence to support findings by the jury. Without conceding that the majority correctly states the proposition which the finder of facts should determine, I will say that here there was substantial evidence that the defendant driver had actual knowledge of the so-called existing danger, he testified he knew of it and was looking for it, and the evidence would support a finding that he saw it when he was a quarter of a mile distant

and that thereupon he proceeded without any heed of or concern for the consequences. In the language of Claussen v. Estate of Johnson, 224 Iowa 990, 998, 278 N.W. 297, 301: "The degree of visibility of the trailer [struck by defendant's automobile], as shown by the evidence, was such that it was a jury question as to when it must have been seen by Johnson, if he was looking ahead."

Following the statement concerning what "we should determine" the majority opinion concedes there is testimony by plaintiff that defendant had been over this road before. It will be observed the majority does not go so far as to concede there was evidence defendant *had driven* over the road. Apparently the majority is unwilling to consider this part of plaintiff's testimony. Upon this point, it next states: "The defendant testified he had not driven over the road but had ridden over it a couple of nights before."

After this statement the majority opinion quotes at length defendant's story that he slowed down to 45 miles per hour, thought there was a dead end ahead and was looking for a dead-end sign. It does not consider nor mention plaintiff's testimony that after running the stop sign 1.6 miles away defendant, "took right off and kept right on going" and that "the car was going at a fast rate of speed when it came to the dead end." The majority opinion states also: "There is no other evidence of Wendell's knowledge relative to the 'dead-end' intersection." Again I point to the evidence from which the jury could properly have found he saw it a quarter of a mile away.

The majority opinion next states: "We have held where the driver does not have conscious knowledge that a road ends at a T intersection one is not guilty of recklessness in not observing the character of the intersection."

Without agreeing with that statement I will say one answer to it is that the testimony of both parties shows defendant did "have conscious knowledge" that the road ended at this T intersection. However, the majority opinion next states defendant "did not know just where it was." One answer to this reasoning is that the jury could have found defendant did know its location. Another is it was visible to defendant for a quarter of a

mile and the evidence was sufficient to support a finding of the jury that defendant observed it a quarter of a mile ahead.

Defendant testified that when his car reached the bottom of the hill, which the evidence shows was about 420 feet distant, his lights shone on the stop sign. In defendant's own words:

"There was a stop sign at Highway No. 12. I saw that stop sign that night. As I came down that incline my lights did not shine on that stop sign. After I leveled out, my lights would shine on that stop sign. * * * On the night of the accident I'd say I was about 100 feet from the stop sign when I first saw it, and I tried my best to stop the car."

Defendant does not explain what he did during the time his car was traveling between the place where he testified his car "leveled out" and his lights shone on the stop sign and the place 320 feet nearer the stop sign, where he testified he first tried to stop his car.

The majority opinion next makes a finding of fact: "When he did observe the stop sign and road he put on the brakes and sought to turn the car and avoid hitting the embankment across the road." This is based on defendant's testimony only. There is much evidence to the contrary. It is followed by this pronouncement and finding of fact: "It is our considered conclusion the defendant driver did everything he could to avoid the accident and that he did not proceed 'without any heed of or concern for the consequences.'" This conclusion usurps the function of the jury, whose finding to the contrary is supported by the great weight of the evidence.

After citing several authorities, none of which is in point factually, the majority opinion continues its finding of fact, as follows:

"In the present case the brakes were put on approximately 162 feet from the ditch. It may be true the driver then tried to straighten up the car when it began to skid but he was endeavoring to control and stop it. He also endeavored to turn it to the left."

The majority opinion next makes another finding which is necessarily based upon defendant's testimony, considered in the light most favorable to defendant: "All these acts, it is our

conclusion, do not indicate a lack of or unconcern for consequences." This is followed by the citation of several cases, none of which is factually in point.

The majority opinion next states: "It is when a driver has conscious knowledge of a dangerous situation and then does not exercise the slightest care to avoid injury to his guest that recklessness is shown." The majority opinion next cites several authorities, none of which is factually in point. Following this the majority makes a finding of fact: "Such is not the situation in the present case."

Division V of the majority opinion consists of a finding of fact seasoned with a legal quotation:

"Upon a review of the evidence heretofore set out, as well as all the evidence disclosed by the record we are unable to conclude '* * * the consequences of the actions of the driver are such that the occurrence of the catastrophe is a probability rather than a possibility.'

"There is nothing to indicate the action of the driver, in the light of what he endeavored to do, showed there was a probability of a catastrophe rather than a possibility."

What the majority refers to as the *evidence heretofore set out* is largely defendant's story of the accident. The evidence, *not set out by the majority,* includes, in part, the testimony of plaintiff that the car was going at a fast rate of speed and that defendant did not "hit his brakes" until "there was the blacktop right ahead of us." Another part of the evidence *not at any place set out or even mentioned* by the majority opinion is the testimony referred to in Division II of this dissent. To the testimony there set out may be added:

"As you come over the hill your lights come down and it shows right on No. 12. You can see a low embankment and you can see black posts. As you see it you can read it. As you come down within about 410 feet you can see the whole road and you can read the whole stop sign. In the daytime you can see everything. At night because of the fact that you are going down hill there is a point at which your lights can shine down and your lights don't shine out onto the stop sign and on this road embankment."

The testimony immediately following the foregoing is set out in Division II hereof, and is in part: "Q.—there is a point there at which * * * your lights don't shine out onto the stop sign and on this road embankment, is that right, sir? A. Yes. Within about 1200 feet she comes back up and you can see everything."

The jury could have found defendant deliberately "ran" this stop sign, with same mental attitude as that exhibited when he "ran" the last previous stop sign, 1.6 miles to the east.

Were it proper for me to pass upon the facts of this case, as the majority has done, I would not be inclined to agree with the holding of the majority that there is no probability of a catastrophe when an automobile "runs" a stop sign at a T intersection "at a fast rate of speed."

VII. I have pointed to some of the various findings of fact by the majority and have stated such procedure was improper. Objections to this procedure should not have been summarily brushed off by the majority.

Whiting v. Stephas, 247 Iowa 473, 477, 74 N.W.2d 228, 230, 231, states: "The question is not for us to decide as to the matter of whether or not there was recklessness involved. That is a question for the jury. However, it is the responsibility of a trial court, and now of this court, to decide whether or not the evidence is so substantial that such question should be submitted to the jury. From the circumstances, and the physical facts and other supporting evidence heretofore outlined, a jury could find speed. Adding to this the many attendant circumstances, also heretofore shown, they could find recklessness. We hold there is sufficient evidence for submission to the jury."

Headnote 2 of the cited case in the Northwestern Reporter states: "On appeal by guest from judgment sustaining a directed verdict * * * in action under the automobile guest statute for injuries, it was not for the Supreme Court to decide whether or not there was recklessness within the meaning of the statute, since that was a question for the jury, but it was the responsibility of the Supreme Court to decide whether or not the evidence was so substantial that the question should have been submitted to the jury."

The Key number given in West's Digests for this rule is

866(3), Appeal and Error. The majority should not have changed this rule of law without overruling this part of Whiting v. Stephas and the many other decisions cited under the Key number.

Hahn v. Strubel, supra, 243 Iowa 438, 446, 52 N.W.2d 28, 32, an automobile guest case, states: "It is for the jury and not for the court to draw inferences from the evidence shown. Olson v. Southern Surety Co., 201 Iowa 1334, 208 N.W. 213. See also Russell v. Turner, 8 Cir., Iowa, 148 F.2d 562."

VIII. I have stated that none of the decisions cited by the majority is in point factually. None of them involves injuries to a guest in an automobile resulting from the running at a fast rate of speed, of a stop sign at a T intersection, with which intersection the driver is familiar, and for which stop sign and intersection he is consciously keeping a lookout, and which intersection and stop sign are visible to the driver at a distance of one-fourth mile and thereafter continuously from a distance of 1200 feet to the intersection.

Other circumstances shown in the case at bar are the wild, night drive for eight miles by the seventeen-year-old defendant, up and down the "awful steep hills" traversed by the gravel road, at 85 miles per hour, through blind intersections and through stop signs, and over plaintiff's protests, at which defendant laughed and which he disregarded.

Crowell v. Demo, 231 Iowa 228, 1 N.W.2d 93, in which a judgment for the guest was affirmed, involved high speed at night on a gravel road over protests of the guest. The car struck a tree which had blown down and which blocked the road. Among other similar decisions are: Anderson v. Elliott, supra, 244 Iowa 670, 57 N.W.2d 792; Mescher v. Brogan, supra, 223 Iowa 573, 272 N.W. 645; Thornbury v. Maley, 242 Iowa 70, 45 N.W.2d 576; Hahn v. Strubel, supra, 243 Iowa 438, 52 N.W.2d 28.

None of these cited authorities appears to be as strong as the case for this plaintiff, if the parts of the record favorable to plaintiff be considered.

In Whiting v. Stephas, 247 Iowa 473, 478, 74 N.W.2d 228, supra, there is a good discussion of pertinent decisions of this court. It quotes with approval a statement from Hahn v. Strubel, supra. Plaintiff "was then a beneficiary of the rule that the

evidence must be viewed in the light most favorable to her. Likewise she was entitled to every legitimate inference from the facts shown. In addition she was to have taken as established every fact which her evidence fairly tended to prove. * * * In addition she would be entitled 'to the benefit of all the facts which the evidence offered by him tends to prove, giving them the most favorable construction of which they are fairly susceptible in support of his claim.' Thompson v. Cudahy Packing Co., 171 Iowa 579, 581, 151 N.W. 470, 471."

Whiting v. Stephas (page 480) refers also to Anderson v. Elliott, 244 Iowa 670, 57 N.W.2d 792, stating: "There is evidence of speed together with road signs and when defendant attempted to go around the curve his car left the pavement and ran into a rather deep depression between the roads, and the guest was killed."

The Whiting case (also page 480) cites Thornbury v. Maley, 242 Iowa 70, 45 N.W.2d 576, and states with reference to the driver in that case: "He came to a sharp curve in the road where there was a road sign indicating a turn. However, his automobile failed to make the turn and left the highway * * * and the driver and plaintiff's intestate were killed. * * * In the case under consideration [Whiting v. Stephas] the question of whether or not the jury decides as to excessive speed depends on circumstances and physical facts, and such other evidence as is shown in the record. The circumstance of road signs is present in both cases, except in this case there were more road signs than in the above cited case."

Whiting v. Stephas (page 481) continues: "* * * Hart v. Hinkley, 215 Iowa 915, 247 N.W. 258, is a case somewhat similar to this case. * * * The turn started before arriving at the bridge and then again turned after leaving the bridge. The driver had crossed the bridge and failed to make the second turn, driving into a ditch, and plaintiff's intestate was killed. Speed and roadway circumstances were involved in said case. * * * The court made some significant statements * * * which have a bearing on this [Whiting] case, as follows: 'Something more is shown in this case than mere speed. Seventy miles per hour in the nighttime upon a gravel highway would be more or less hazardous at the best. When considered in the light of the sur-

roundings and circumstances shown in this case, we think the evidence quite sufficient to sustain the verdict against the driver of the automobile. * * * It is obvious from the testimony that the driver of the automobile lost control thereof because the speed at which he was driving was so great that he was unable to maintain control of the car and guide it across the bridge and make the necessary turn to the left. It may be that the speed of the car was less than seventy miles per hour, but when considered in the light of the facts and circumstances, was so great as to constitute reckless operation within the meaning of the statute.' "

Whiting v. Stephas, supra, 247 Iowa 473, 74 N.W.2d 228, which has been referred to herein and quoted from at some length, was written recently by a member of this court who now concurs in the majority opinion, and was concurred in by all other members of the court. The legal propositions approved and followed in that case and decisions therein cited are repudiated by the majority in the case at bar. The majority has the power to do this but it has not the power to make the various findings of fact upon which it bases its conclusion. Article V, section 4, Constitution of Iowa; section 624.2, Code of Iowa, 1958; R. C. P. 334. Of equal or greater importance are the various errors of fact in the majority opinion, many of which have been pointed out hereinbefore.

IX. Since this dissent was circulated the majority has added a Division to its opinion, in which it states: "In the light of the comment in the dissenting opinion relative to *speed* it can *again be stated* there is no reference to the probable speed of the car just before the accident *except as previously stated.*" (Italics supplied.) That is not quite correct. In its preliminary statement the majority opinion states: "The only testimony given by the plaintiff relative *to the movement of the car* after it passed the bridge is as follows:" (Italics supplied.)

However, the majority opinion overlooked plaintiff's testimony, "I knew the car was going at a fast rate of speed" until the dissent quoted it. Some indication of this speed is furnished by defendant's testimony: "Q. Did you think that you could make the turn in safety? A. I thought I had a chance, maybe, of making it."

In the face of this and other evidence the jury was not required to believe defendant's story that he was driving at a rate of only 45 miles per hour and was unable to make the turn 162 feet after he applied the brakes of the car.

GARFIELD, C. J., joins in this dissent.