STATE OF IOWA, appellee, v. MYRON E. MCLAUGHLIN, appellant.

No. 49495.

(Reported in 94 N.W.2d 303)

JANUARY 13, 1959.

William Mooney, of Waverly, and J. D. Robertson, of Marshalltown, for appellant.

Norman A. Erbe, Attorney General, Evan L. Hultman, County Attorney, and William Ball, Assistant County Attorney, both of Black Hawk County, for appellee.

THOMPSON, C. J.—On June 13, 1957, at about 10:50 p.m., the defendant was driving a 1956 Ford convertible on Allen Street in the City of Waterloo. He was accompanied by a girl friend, Laurel Wilson, who was riding in the right-hand side of the front seat, and by Arden Dempewolf and his fianceé, Eyvonne Warneke, who were in the rear seat. There is evidence from which the jury could have found that as the vehicle approached the intersection of Allen Street with Fifth Street

it was being driven at from 45 to 50 miles per hour. Other estimates of the speed placed it at 35 to 40 miles. The legal speed limit on Allen Street at this point was 25 miles per hour.

At the intersection of Allen and Fifth Streets there was a stop sign on both sides of Allen Street. The defendant was not familiar with the streets, and testified that he did not know of the stop sign until he saw it as he approached, perhaps some seventy feet back of the intersection. He at once applied his brakes, but was unable to stop before reaching the intersection. Allen Street at this point is twenty-four feet wide, and Fifth Street slightly over thirty feet. At the time the defendant's car entered the intersection another vehicle, driven by Ray Paul, with Benjamin F. Butler riding in the front seat with him, was approaching on Fifth Street from defendant's right. Both cars had their lights burning, and there was a street lamp at the intersection which was lighted. The stop sign was of the reflector type, visible some distance back from the intersection. There were some buildings on the corner of the intersection which interfered with the view of traffic on Fifth Street from Allen Street. The brakes on defendant's car were in good condition, and the tires were good.

The result of defendant's failure to stop at the stop sign and to yield the right of way to the Paul car was a collision about in the center of the intersection, in which the front end of defendant's car struck the Paul car on the left side in the fender near the front door. Skid marks made by the Ford's tires measured 88 feet and 6 inches from the point on Allen Street where they commenced to the point of impact. The Paul car, a DeSoto, came to rest 12 feet from the point of impact, while the Ford moved about three fourths of its own length.

Mr. Butler was found lying in the front seat of the car after the collision. He was taken to a hospital, and there is medical testimony that he had sustained a severe skull fracture, and that his death, which occurred about 5:15 a.m. on the following morning, was due to this injury. There was testimony from other doctors that death was caused by a coronary occlusion not connected with the accident and skull fracture; but the cause of death was clearly a question for the jury's determination, and it is not contended otherwise.

On September 5 following the grand jury of Black Hawk
County returned an indictment against the defendant, charging
him with the crime of manslaughter, committed by unlawfully
operating a motor vehicle upon a public highway in violation of
Code section 321.283 (reckless driving); section 321.285 (driv-
ing beyond the fixed speed limit); section 321.288(3) (failure
to have his car under control and to reduce speed to a reason-
able rate when approaching and traversing a crossing of public
highways); section 321.297 (failure to travel on the right-hand
side of the street); section 321.319 (failure to yield the right of
way at an intersection to a vehicle approaching from the right);
and section 321.322 (failure to stop at a stop sign). The indict-
ment also charged that the defendant operated a motor vehicle
"in such a reckless and wanton manner in disregard of the safety
of other persons as to kill one Benjamin F. Butler, contrary to
and in violation of section 690.10 of the Code of 1954." Section
690.10 is our general manslaughter statute which fixes the pun-
ishment for one who commits this crime. Upon trial the defend-
ant was found guilty as charged, a following motion for new
trial was denied, judgment was entered and sentence pro-
nounced, and we have this appeal.

I. The defendant assigns three errors relied upon for re-
versal: 1. Failure to grant a motion for directed verdict at the
close of the State's case. 2. Failure to grant the same motion
renewed at the close of all the evidence. 3. Failure to grant
his motion for a new trial. It will be observed that each of the
grounds is quite general; but the real points relied upon are
made clear in the argument, and we shall follow them as we
understand them.

The first assigned error raises no appealable question,
since the trial court may, but is not required to, sustain a motion
to direct at the close of plaintiff's evidence. However, the point
is not important, since the same question is raised by Assigned
Error No. 2, which is based upon the denial of the motion to
direct at the close of the entire case. Here it is defendant's con-
tention that there is no sufficient showing of recklessness on his
part to warrant submission of the issue to the jury.

The facts set out above are of controlling importance
at this point. The question of recklessness in criminal cases is

different from the same issue in civil cases. State v. Richardson, 216 Iowa 809, 812, 249 N.W. 211, 212; State v. Graff, 228 Iowa 159, 175, 290 N.W. 97, 104. Recklessness as a crime is defined by section 321.283, Code of 1954, in these terms: "Any person who drives any vehicle in such manner as to indicate either a willful or a wanton disregard for the safety of persons or property is guilty of reckless driving." This statute was considered by us in State v. Hill, 239 Iowa 675, 679, 32 N.W.2d 398, 400, where we said: "Reckless driving is not an intentional wrong in the sense that resulting harm is intended. The statute is violated by conscious and intentional driving which the driver knows, or should know, creates an unreasonable risk of harm to others." Restatement of the Law, Torts, section 500, is cited; and see State v. Miskell, 247 Iowa 678, 687, 73 N.W.2d 36, 41. In State v. Graff, supra, at page 172 of 228 Iowa, page 103 of 290 N.W., we applied this statute to manslaughter cases arising out of traffic injuries. We said: "If the evidence will warrant the jury finding that the defendant violated a speed limit fixed by statute or ordinance, and did so in such a manner as to show a wanton and reckless disregard and indifference for the safety of other persons who might reasonably be expected to be injured thereby, and as a result thereof, the victim was fatally injured, a verdict of manslaughter will be sustained."

In the Graff case, the injured person was standing at the rear of a car stopped upon the highway at night when she was struck by the defendant's automobile which approached from the rear at a speed of 35 to 40 miles per hour, her death resulting. There was no fixed speed limit at the place of the accident, the general statute on driving at a reasonable rate in view of circumstances being the only criterion. But we held there was a jury question upon defendant's recklessness and so upon manslaughter. Many other cases are cited and analyzed in the Graff case, which is perhaps the leading one in Iowa on the question we are here considering.

It is true that we have said unlawful speed alone does not make a case of manslaughter, even though a death results therefrom. State v. Thomlinson, 209 Iowa 555, 558, 228 N.W. 80, 81. But if added to it there is conduct from which it may be inferred that the defendant was utterly careless, and reck-

lessly disregarded the rights of others upon the highway, then a jury issue is engendered and a verdict of manslaughter is permissible. In the case at bar the defendant was clearly violating the established speed limit of 25 miles per hour. No one denies this. He was upon an unfamiliar and narrow street. He says he did not know of the approaching stop sign at the entrance to Fifth Street. But any driver must realize that such signs are frequent in cities and towns, and that one may be reached at any intersection when he does not know to the contrary. See Mescher v. Brogan, 223 Iowa 573, 580, 272 N.W. 645, 648.

Yet the defendant drove down Allen Street at a speed which the jury might have found was from 40 to 50 miles per hour, giving no heed to the approaching intersection until he saw the stop sign. This brings up another question. Did he intend to stop, or even to slacken speed for the intersection, if there had been no stop sign? The law requires that intersections of highways, which include most especially city streets, must be entered carefully and that the right of way must be yielded to vehicles approaching from the right. The record indicates that the defendant had made no preparation for slowing his speed until he saw the stop sign, when he applied his brakes but was unable to stop. Skid marks showed some 73 feet back of the entrance to the intersection. Apparently the only effect of the stop sign was to slow defendant's speed and so make the crash somewhat less destructive and deadly. If Fifth Street had not been guarded by the stop sign there is no indication defendant would have slowed at all. He should have had his car under control as he approached the intersection, regardless of any stop sign; but it is evident he did not.

There is ample evidence that the defendant was violating the fixed speed limit; that he failed to have his car under control and to reduce speed to a reasonable rate when approaching and traversing a crossing of public highways; that he failed to stop at a stop sign; and that he failed to yield the right of way at an intersection to a vehicle coming from his right. While it may be that all these violations would not necessarily and in all cases add up to reckless driving within the meaning of section 321.283, we think that here the entire record shows a definite

jury question as to whether the defendant knew, *or should have known,* that he was creating an unreasonable risk of injury to others.

■ Nor does the fact that when he first observed the stop sign he applied his brakes absolve him. One who, by his recklessness, has created a hazard which he should have foreseen and guarded against is not exonerated from the charge of gross indifference to the safety of others by a futile last minute effort to retrieve the situation and avoid the danger and injury. Such an attempt may have some bearing upon the degree of the indifference, but it is not an absolute cleaning of the slate. Mescher v. Brogan, supra, at page 578 of 223 Iowa, page 648 of 272 N.W.

We find defendant's Assigned Errors Nos. 1 and 2 to be without merit.

II. Defendant's third assigned error is based upon the fact that some of the jurors read newspaper accounts of the proceedings and of the purported facts of the case, and watched telecasts and heard radio broadcasts thereof, after they had been sworn in to try the case and before it was finally submitted to them; in other words, during the progress of the trial. The case was one which had aroused considerable interest in Waterloo and vicinity, and was given considerable coverage by the various news distributing agencies. Defendant's motion for new trial raised the question that the jurors had improperly read, watched and heard these news accounts. The foreman of the jury made affidavit that he had read newspaper accounts and watched television and heard radio reports during the course of the trial. There was a hearsay affidavit that four other jurors had done so.

On December 10, the day the jury was selected and sworn, the Waterloo Courier, a daily newspaper with a wide circulation in that vicinity, printed this:

"McLaughlin, of 263 Derbyshire Rd., was reportedly the driver of a car involved in a two-car collision the night of June 13 at the corner of W. 5th and Allen Sts. Driver of the other car was Ray S. Paul, 60, of 521 Derbyshire Rd., who died eight days later. McLaughlin is charged with manslaughter in the death of Butler, according to a grand jury indictment. Paul's death is not mentioned in the indictment."

This statement, in somewhat different wording, was repeated in later issues during the trial, and was made in effect by the television and radio stations. On December 11 this report appeared in the Courier: "The contention that Ben F. Butler died of natural causes rather than as the result of injuries suffered in an automobile accident June 13 will apparently be the major point in the defense of Myron McLaughlin on a manslaughter charge."

The matter contained in the first quotation above which the defendant thinks prejudiced him to the extent that he did not receive a fair trial was the statement that Mr. Paul died eight days later. The matter of his death did not appear in the evidence, and whether he died as a result of injuries received in the collision or from other causes was not shown. It is the defendant's thought that this naturally led to the inference that two men instead of one had died as a result of the accident, that it must have influenced the jury and made the accused's crime seem graver; and that, it being something outside of and beyond the evidence in the case, it must conclusively appear that he did not have a fair trial. He also complains that the conclusion of the newspaper reporter that the defense was based chiefly upon the contention that Mr. Butler died of natural causes rather than of injuries suffered in the accident was unfair and wrong, and likewise prejudicial.

No request was made for segregation of the jury, and the members were permitted to separate during the course of the trial. Sections 780.21 and 780.22, Code of 1954, require the trial court to admonish the jury that it is their duty not to permit any person to speak or communicate with them on any subject connected with the trial and that they should not form or express an opinion about the case until it is finally submitted to them; and this admonition is to be repeated at each adjournment of the court during the trial. It is not contended it was not properly given. No specific reference was made to newspaper or television or radio accounts. But in its Instruction No. 17 the trial court told the jury: "In passing upon the issues in this case, you should be governed solely by the evidence and these instructions. * * * Because this case has received public notice, you are particularly cautioned and instructed

that publicity of any kind and the remarks and conversations of others not in evidence in this case are not to be considered by you in reaching your verdict herein."

The defendant relies largely at this point upon State v. Caine, 134 Iowa 147, 111 N.W. 443; State v. Peirce, 178 Iowa 417, 159 N.W. 1050; and State v. Walton, 92 Iowa 455, 458, 61 N.W. 179, 180. The latter case is not difficult to distinguish. It appears that while the jury was deliberating certain newspapers found their way into the room. "The said newspapers were full of criticisms and complaints of the proceedings of the courts in failing to bring criminals to justice. There were what appeared to be full reports of the evidence taken upon the trial of the defendant, and the addresses of the counsel to the jury, with fulsome commendation of the arguments of counsel for the state."

No such partisanship on the part of the news agencies appears in the record in the case before us.

Perhaps State v. Peirce, supra, might be to some extent distinguished also; for it is said, at page 431 of 178 Iowa, page 1056 of 159 N.W.: "The exact effect of the newspaper article as to witness Griffin was to tell the jury that defendant had put on a corrupt witness, and that the authorities were charging the witness with perjury—that she committed perjury to aid the defendant."

No newspaper account introduced into the record in the instant case contains any such prejudicial matter. But there is language in the Peirce case which is susceptible of the interpretation that any reading of newspaper accounts of a trial during its progress is such misconduct on the part of the jury as to require a new trial; and State v. Caine, supra, seems to hold this flatly. There this court referred to section 5383 of the Code, identical in substance with our present section 780.21, supra, and said that reading of newspaper accounts is thus prohibited by statute, were references to the case which the jurors should not have received, and the reading of them constituted prejudicial error requiring a reversal.

 The Caine case, and much of the language of the Peirce case, are contrary to the general rule governing such matters, and we think cannot be further followed to their fullest

extent. The principles which should logically govern are set forth in the annotations to 31 A. L. R.2d 417, at page 421: "* * * a fair trial is not interfered with by a newspaper account of the trial which does not prejudice either party and could not be said to put either in a bad light in the minds of the jurors." A corollary rule is that the trial court has a considerable discretion in determining whether the offending news accounts were reasonably calculated to influence the jury in reaching its verdict. State v. Cunningham, 173 Ore. 25, 144 P.2d 303; Sanders v. Beckwith, 79 Ariz. 67, 283 P.2d 235, 237, 238; Eichten v. Central Minnesota Co-operative Power Association, 224 Minn. 180, 28 N.W.2d 862, 867; United States v. Pisano, 7 Cir., 193 F.2d 355, 361; 31 A. L. R.2d 409; People v. Malmenato, 14 Ill.2d 52, 150 N.E.2d 806, 812. The rules are comprehensively stated in 89 C. J. S., Trial, section 457(h), page 87: "* * * it is usually held that the fact that jurors have read newspaper accounts or comments, which are not of a highly damaging character or inspired by a party to the suit, does not of itself vitiate the verdict, nor is it such misconduct as to require the trial court to withdraw or discharge the jurors from the case, it being largely within the discretion of the court whether or not the jurors will be withdrawn or discharged."

We ourselves have retreated considerably from the strict doctrine of the Caine case in State v. Siegel, 221 Iowa 429, 431, 432, 435, 264 N.W. 613, 614, 616. There a jury heard remarks from bystanders on the street, while its members were out of the jury room for the purpose of procuring meals; these remarks being derogatory to the defendant. There was also a showing two jurors observed certain headlines in a newspaper, to this effect: " 'Stick to it says Siegel judge. Defense loses motion to let jury quit task. No reason for disagreement.' " We held the trial court was within its discretion in finding that these things did not so prejudice the jury as to deny the defendant a fair trial.

We conclude that our real problem here is to determine whether the trial court abused its discretion in holding that the defendant received a fair trial, notwithstanding the reading of the newspaper articles and observing the telecasts and listening to radio broadcasts by the jurors, or some of them. It is not

contended that either party had anything to do with these newscasts. But the defendant thinks the repeated statement concerning Mr. Paul's death following the collision was highly prejudicial to defendant's case. The able trial court, however, had an effective answer for that. In its ruling denying the motion for new trial, it said:

"* * * Attorneys for the defendant, when they went into the trial of this case, knew that the prominent facts, among which are the above, were well known to the people of this community. In their questions on voir dire, which was reported in full, both counsel for the State and the defendant showed that they made this assumption and then directed their inquiries as to whether the juror was prejudiced by having received such information. In each instance the prospective juror demonstrated on voir dire that he was aware of the case, had read and heard about it. Specifically, the affiant Walter Brown stated on voir dire that he knew Ray Paul, an official of Rath Packing Company, when he was their employee, and believed him to be the man involved in the accident; that he had read about the case in the newspaper, and that a number of people had discussed it with him.

"If the jurors knew anything about it at all, they knew that two people died. It would be naïve and unrealistic in the extreme to say that this jury, knowing from every source of news and from the record in this case that two men, Benjamin F. Butler and Ray Paul, were riding in the damaged vehicle then did not know that Ray Paul died. * * *."

There had also been one reference to the fact that the defendant did not have a driver's license. This the court said had also been well publicized prior to the trial; and it concluded that there was nothing in the various newscasts and publications which was not in all probability known to the jurors before they were selected, and which defendant and his counsel must have expected would be known to them. Under these circumstances we cannot say the court abused its discretion in denying a new trial.

In fact, it must be apparent that to follow the narrow rule of the Caine case would be to vitiate verdicts in almost all cases in which the jury is not strictly segregated. The citizens

of Iowa are highly literate; they are interested in world affairs, and in the news of their State and of their communities. They follow events closely; and the fact of their selection as members of a jury does not automatically eliminate their desire to keep up with the times. When they are permitted to disperse at adjournments of the trial, it is inconceivable that they will not read newspapers and listen to telecasts and broadcasts. No matter how conscientiously they may try to avoid reading or listening to accounts of the trial in progress, and especially when the case is one which has aroused considerable interest, they will be faced with headlines or will advertently hear some comment from a newscaster concerning the matter before them.

But each juror has taken an oath which requires him to try the case solely upon the evidence submitted, guided by the court's instructions. We think a rule which assumes as a matter of law that the mere reading or listening to newspaper or television or radio broadcasts of accounts of the trial is prejudicial misconduct of the jury goes too far, and we decline to follow it. Insofar as State v. Caine and State v. Peirce, both supra, announce such a rule they are overruled. We hold the true rule to be that reading or listening to reports of or comments on a trial in progress, by the jurors, or some of them, is not necessarily prejudicial error. Something must appear which leads to the conclusion that the jury was unfairly influenced by these extraneous matters; and in determining this, the trial court has a considerable, although not always final, discretion.

Applying this rule to the case before us, we think the court did not exceed the limits of a fair discretion. The death of Mr. Paul eight days after the collision must have been previously known to the jurors, if they had read of the matter, as they said they had; and the same is true of the fact that the defendant had no driver's license. As to the statement that the defense relied chiefly upon proof that Mr. Butler died from natural causes rather than from injuries sustained in the accident, the record shows that there was considerable evidence introduced to that effect; and in view of the admonitions of the court and its Instruction No. 17 quoted above we cannot hold that the jurors were unfairly influenced by what was said.

The evidence was before them; they had sworn to decide solely upon it, and had been admonished and instructed to consider nothing else. The defendant was entitled to a fair trial; the trial court found he had such a trial, and we find no error.— Affirmed.

BLISS, GARFIELD, GARRETT, LARSON, and PETERSON, JJ., concur.

OLIVER, J., concurs specially.

THORNTON, J., takes no part.

OLIVER, J. (concurring specially)—I concur specially in this opinion and call attention to the following language at the end of Division I:

"Nor does the fact that when he [defendant] first observed the stop sign he applied his brakes absolve him. One who, by his recklessness, has created a hazard which he should have foreseen and guarded against is not exonerated from the charge of gross indifference to the safety of others by a futile last minute effort to retrieve the situation and avoid the danger and injury. Such an attempt may have some bearing upon the degree of the indifference, but it is not an absolute cleaning of the slate. Mescher v. Brogan, supra, at page 578 of 223 Iowa, page 648 of 272 N.W."

That the foregoing statement is correct is hardly open to question. However, it is directly contrary to a recent holding of the majority that such evidence furnished a basis for a directed verdict for defendant in a civil case based upon a charge of recklessness. That decision, Hartman v. Kruse, 249 Iowa 1320, 1326, 91 N.W.2d 688, 691, states:

"We should also consider whether there is evidence of 'no care, coupled with disregard for consequences.' In the present case there is undenied evidence the defendant driver, as soon as he observed the stop sign at the Highway No. 12 T intersection, put on the brakes of his car. It was then 100 feet from the stop sign. From this point it skidded into the intersection and then proceeded another 62 feet to the west shoulder of Highway No. 12 and rolled over. As the car skidded into the highway

the defendant driver, according to his testimony, "* * * thought I had better straighten it out and it kept going. Then I thought, well, there is a telephone pole straight ahead and a big embankment—a low embankment, but I didn't want to hit that so I tried to turn to the left.'

"We are unable to conclude the driver's actions showed '* * * acts utterly inconsistent with prudence or proper regard for the safety of the guest in his car, from which the inference could be drawn that the operation of the vehicle was reckless.' "

The foregoing holding in the Hartman case may not be excused as an oversight of the court since the dissenting opinion in that case called attention to it and cited as authority to the contrary the identical statement from Mescher v. Brogan, supra, cited as authority for the holding in the case at bar. The dissenting opinion in Hartman v. Kruse, supra, 249 Iowa 1320, 1335, 1336, 91 N.W.2d 688, 697, states:

"In Division III the majority opinion states that as soon as defendant saw the stop sign at the T intersection he put on the brakes and as the car skidded 100 feet into the intersection he tried to turn to the left to avoid the telephone pole and embankment. The opinion then appears to hold 'there is no evidence the driver did not do everything in his power to avoid the accident' and hence no 'inference could be drawn that the operation of the vehicle was reckless.'

"That proposition was considered in the much cited case of Mescher v. Brogan, 223 Iowa 573, 578, 272 N.W. 645, in which the driver was operating the automobile over a wide, well-settled gravel highway, with which he was unfamiliar, at a speed of 65 miles per hour at night and was unable to negotiate a turn:

" 'There is nothing in the testimony to indicate that the driver did not exercise all the care possible to avoid injury after he discovered the corner or turn in the road. In other words, there is no evidence of recklessness, or even want of care, in the operation of the car from the moment the defendant discovered that he could not make the turn in safety. The recklessness, if any, consists in the high rate of speed at night with visibility limited, coupled with his apparent attitude of indif-

ference to consequences [etc.], * * * and * * * it was for the jury to determine, and not a case presenting facts upon which minds of reasonable men might not differ as to whether the conduct of the defendant came within the definition of recklessness, as defined by this court, as hereinbefore set forth.' "

In the Hartman case the majority declined to mention or even consider the sound doctrine so clearly stated in Mescher v. Brogan, supra, and in effect overruled it. Now the case at bar overrules Hartman without mentioning it and reinstates the rule of Mescher v. Brogan. The court should have ended this conflict by expressly overruling the Hartman case.