# IN THE COURT OF APPEALS OF IOWA

No. 22-0089
Filed February 8, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JOHNNY BLAHNIK CHURCH a/k/a DREW ALAN BLAHNIK,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Christopher L. Bruns, Judge.

A criminal defendant appeals his convictions for second-degree murder, obstructing prosecution, and defacing a corpse. **REVERSED AND REMANDED.**

Leon F. Spies of Spies & Pavelich, Iowa City, for appellant.

Brenna Bird, Attorney General, and Nicholas E. Siefert and Louis S. Sloven, Assistant Attorneys General, for appellee.

Heard by Tabor, P.J., and Schumacher and Ahlers, JJ.

**TABOR, Presiding Judge.**

Johnny Blahnik Church appeals his convictions for second-degree murder, obstructing prosecution, and defacing a corpse. He raises a single issue: did the district court abuse its discretion in giving a verdict-urging instruction on day four of jury deliberations? We must decide whether that *Allen* charge was coercive under the totality of the circumstances.[1] Because the jury's notes to the court revealed open hostility toward a lone holdout juror, it was an abuse of discretion to give the instruction. We thus reverse the convictions and remand for a new trial.

## I.     Facts and Prior Proceedings

The trial evidence is not critical to the issue on appeal. But it helps set the stage for the jury's questions to know that Church claimed he was justified in stabbing Christopher Bagley. The jury heard varying witness accounts on whether Bagley was armed during their confrontation. Armed or not, Bagley suffered at least thirteen stab wounds, including debilitating injuries to his neck, chest, and abdomen. The State also presented evidence that Church helped bury Bagley's body in an accomplice's yard. Then Church lied to investigators and a grand jury about what happened.

That grand jury indicted Church for first-degree murder, obstructing prosecution, and defacing a corpse. Church's 2021 trial started Friday, July 16 and lasted until the jury began deliberating at 4:06 p.m. on Monday, July 26.[2]

---

[1] The common name for a verdict-urging or "dynamite" instruction comes from *Allen v. United States*, 164 U.S. 492, 501 (1896).

[2] The jurors had roughly one-half hour to deliberate that first day, as they separated for the night at 4:41 p.m. The record shows that the jurors deliberated for about three hours on Tuesday, July 27, beginning at 9 a.m. and separating at noon.

On Wednesday, July 28, the jury started passing a series of notes to the court. The first came at 9:02 a.m., asking for "confirmation" of two specific lines from "the grand jury's testimony." Neither the attorneys nor the court was sure what transcript lines the jury was referring to, but all agreed to respond that they must rely on the exhibits and their recollection of the testimony.

Then at 2:17 p.m., the jury asked for guidance on two jury instructions on justification. The note read: "Can instruction 45 & 46 have to cover the entire incident (physical confrontation)," and then in separate handwriting the note continued, "or can it cease when we believe that the imminent danger is no longer a threat." Rather than providing a supplemental instruction, the court told the jury to re-read the original instructions.[3] The jury deliberated for about seven hours that day.

Next morning, Thursday, July 29, at 10:06 a.m., the jury sent another note: "A juror is failing to follow specific rules set forth by you in the rule packet provided. In regards to 45 + 52."[4] Based on that communication, the court believed that the jury was deadlocked. But it responded: "As previously instructed, you are required to apply the law set forth in the instructions already provided to you."

---

[3] The instructions at issue were number 45 on reasonable force, including deadly force, and number 46, listing circumstances when use of force is not justified.

[4] Instruction number 52 read:
> The person using deadly force shall not intentionally destroy, alter, conceal, or disguise physical evidence relating to the person's use of deadly force, and the person shall not intentionally intimidate witnesses into refusing to cooperate with any investigation relating to the use of such deadly force or induce another person to alter testimony about the use of deadly force.

At 11:15 a.m. that same day, the court informed the attorneys that the jury told the court attendant that it was deadlocked. After being instructed to only communicate with the court in writing, the foreperson sent this note:

> We have a juror that is refusing to follow certain rules set forth by you. We took a vote to whether or not we felt this person was deliberately not following a rule. The vote was 11 to 1. We have gone over this rule numerous times with this juror. The response has been "I don't care, I'm not changing my opinion." Signed, Foreperson.

The court proposed asking the jury if further deliberations would be fruitful. The State requested an *Allen* charge. Defense counsel objected to the State's request, reasoning:

> I think given the communication that the Court has already provided the jurors in the instruction dealing with their duty as jurors to consult with one another, to deliberate with the view to reaching an agreement, if you can do so without violence to individual judgment, that's in the Court's final instruction to the jury.
>     So I think a verdict-urging instruction is—given the communication that the Court has just told us about, would not be productive. I think that the better choice was what the Court's initial response was going to be, namely, do you believe that further deliberation would be productive.

The court denied the State's request, finding an *Allen* charge inappropriate under the circumstances. The court explained that it did not have "any hope whatsoever that [an *Allen* charge] would cause the jury to reach a jury verdict that is consistent with the Defendant's constitutional rights because the jury has basically told me we have a single holdout and we cannot convince that holdout." Instead, the court wrote back: "Do you believe further deliberations would be fruitful?"

At 11:37 a.m., the jury responded: "No, we feel that because the rules set forth by this court are not being followed by a single juror that deliberations would NOT be fruitful. Signed, jury foreperson."

The State renewed its request for an *Allen* charge. Again, Church's attorney objected. He emphasized the likelihood of coercion:

> [I]t would be silly to believe that a verdict-urging instruction at this point would be anything other than coercive. The jury foreperson has communicated to you that there is one person who is adamant about his or her position in this case and for you to give a verdict-urging instruction now would focus directly on that juror and would not be anything other than signaling to that single juror that his or her position in the present state of deliberations is anything other than incorrect or erroneous. So I think given what you already know, what we already know, that a verdict-urging instruction would be coercive, it would deny the Defendant the right to a fair and impartial jury and in violation of his rights to due process under both the state and federal constitutions.

After reviewing case law, the court noted it was still "not entirely convinced that an *Allen* charge is appropriate here." But it decided to give the instruction in the interest of judicial economy:

> [I]f I give an *Allen* charge and then we don't get a verdict and we still have a hung jury, we have a hung jury. If I give an *Allen* charge and we get a verdict, either I or the Appellate Court, if I shouldn't have given the *Allen* charge, can take the verdict away or if it was appropriate to give the charge, leave the verdict standing and we don't have to try the case again.

The court gave the jury the *Allen* charge at 12:08 p.m. At 3:39 p.m. the jury informed the court it had reached a verdict. These three-and-a-half hours of deliberations included a lunch break.

The jury found Church guilty of the lesser-included offense of second-degree murder, as well as obstructing prosecution, and defacing a corpse. The district court then polled the jurors, asking each one: "Is this your verdict?" In open

court, each juror answered in the affirmative. The court instructed members of the media attending the murder trial to turn off recording equipment while polling occurred so the jurors' names would not be broadcast.

Church moved for a new trial, arguing the court abused its discretion in giving the *Allen* charge. The court denied the motion. Church now appeals.

## II. Analysis

Church reprises his argument that the court should not have given the *Allen* charge. We review the district court's decision to give a verdict-urging instruction for an abuse of discretion.[5] *State v. Davis*, 975 N.W.2d 1, 8 (Iowa 2022). Indeed, district courts possess wide latitude to deliver a verdict-urging instruction in the face of jury deadlock. *State v. Campbell*, 294 N.W.2d 803, 808–09 (Iowa 1980). But such an instruction must not coerce a verdict. *Id.* at 808. "The ultimate test is whether the instruction improperly coerced or helped coerce a verdict or merely initiated a new train of real deliberation which terminated the disagreement."[6] *Id.*

In determining the coercive effect of an *Allen* charge, our appellate courts consider each case "on its own circumstances." *Davis*, 975 N.W.2d at 18 (quoting *Campbell*, 294 N.W.2d at 808–09). We will reverse when the accused demonstrates prejudice arising from those circumstances. *Id.* The customary

---

[5] Although neither side advocates for de novo review, we recognize the constitutional underpinnings of Church's claim. *See State v. Piper*, 663 N.W.2d 894, 911 (Iowa 2003), *overruled on other grounds by State v. Hanes*, 790 N.W.2d 545 (Iowa 2010).

[6] As a matter of semantics, the phrase "improperly coerced" means the same as "coerced." In other words, there is no proper coercion. If the instruction "forced or helped to force an agreement," the instruction was improper, and the court abused its discretion in giving it. *See State v. Peirce*, 159 N.W. 1050, 1054 (1916), *overruled on other grounds by State v. McLaughlin*, 94 N.W.2d 303, 310 (1959).

factors in the coercion analysis include the content of the instruction, the timing of deliberations, and responses from jurors when polled about their verdict. *Id.* But we also weigh other factors that may suggest a coercive effect, such as the court's inquiry into or knowledge of the jury's numerical division. *See Piper*, 663 N.W.2d at 912.

Starting with factor one, the instruction's content. After the foreperson informed the court that further deliberations "would NOT be fruitful" because one juror was recalcitrant, the court provided this supplemental instruction:

> You have been deliberating upon this case for a considerable period of time, and the Court deems it proper to advise you further in regard to the desirability of agreement, if possible.
> The case has been exhaustively and carefully tried by both sides and has been submitted to you for decision and verdict, if possible. It is the law that a unanimous verdict is required. While this verdict must be the conclusion of each juror and not a mere acquiescence of the jurors in order to reach an agreement, it is still necessary for all of the jurors to examine the issues and questions submitted to them with candor and fairness and with a proper regard for, and deference to, the opinion of each other. A proper regard for the judgment of others will greatly aid us informing our own judgment.
> Each juror should listen to the arguments of other jurors with a disposition to be convinced by them; and if the members of the jury differ in their views of the evidence, such difference of opinion should cause them all to scrutinize the evidence more closely and to reexamine the grounds of their problem. Your duty is to decide the issues of fact which have been submitted to you, if you can conscientiously do so. In conferring, you should lay aside all mere pride of opinion and should bear in mind that the jury room is no place for espousing and maintaining, in a spirit of controversy, either side of a cause. The aim ever to be kept in view is the truth as it appears from the evidence, examined in light of the instructions of the Court.
> Please continue your deliberations.

Church does not challenge the content of this instruction, conceding that its language tracks versions approved by our court. *See State v. Parmer*, No. 13-2033, 2015 WL 2393652, at *6 (Iowa Ct. App. May 20, 2015); *State v.*

*Power*, No. 13-0052, 2014 WL 2600214, at *5 (Iowa Ct. App. June 11, 2014). But "the content of this type of instruction is only one factor to consider in determining whether the jury was improperly coerced." *Piper*, 663 N.W.2d at 911.

So we turn to factor two, timing of the jury deliberations. Our appellate courts look at dual measures of time in evaluating the coercive effect of an *Allen* charge.[7] The first measure is the length of deliberation after the court gives the charge. The question there is whether the jury engaged in "further worthwhile consideration" after receiving the supplemental instruction. *Davis*, 975 N.W.2d at 19 (citations and internal quotations omitted). The second measure is the ratio of the deliberations before and after the *Allen* charge. This more intricate gauge compares the pre-deadlock and post-deadlock periods. As our supreme court explained "there is more reason to doubt the quality of the verdict when the disagreement is of great length and agreement after the additional instruction is given comes in comparatively a very short time." *Peirce*, 159 N.W. at 1054.

On the first measure, the State insists that the three-and-one-half hours of deliberation—with a lunch break—after receiving the *Allen* charge shows the jury meaningfully reconsidered the case. But Church invokes the second measure, arguing that the jury's relatively short deliberation after the *Allen* charge points to pressure on the holdout when compared to the days spent deliberating before the court gave the supplemental instruction.

---

[7] We also consider whether the jurors have been sequestered and the hour and week day that a jury reaches a decision. *Davis*, 975 N.W.2d at 20. But the parties do not focus on those factors here.

Our case law is a bit squishy when deciding whether a deliberation ratio suggests coercion. On the one hand, the *Peirce* court found prejudice when jurors deliberated forty-eight hours before the *Allen* charge and returned a guilty verdict "something less than four hours" after the charge. *Id.* at 1054–55. On the other hand, the *Davis* court found "[s]pending seven hours deliberating before the verdict-urging instruction and four and a half hours after the instruction is not a suspect ratio to indicate prejudice." 975 N.W.2d at 20. Likewise in *State v. Cornell*, the court found no prejudice when the jury deliberated about fifteen hours before reaching a seven-to-five deadlock and then returned a guilty verdict five hours after the *Allen* charge. 266 N.W.2d 15, 18–20 (Iowa 1978). But *Cornell* did not dwell on the ratio; it instead focused on the five hours of renewed deliberations. *Id.* at 20. At bottom, we are left with this abiding rule: when the jury's disagreement "is of more than ordinary and usual duration" and the *Allen* charge dislodges a verdict "in a time short in comparison with the duration of the disagreement, a presumption arises that the instruction was prejudicial." *Peirce*, 159 N.W. at 1055.

Here, the ratio points to coercion and prejudice. Church's jury deliberated nearly thirteen hours across four days before declaring its deadlock. After the *Allen* charge, it returned a verdict in roughly three hours. That time was short in comparison to the duration, and expressed vehemence, of the jury's disagreement.

We turn next to factor three, post-verdict polling. "The purpose of polling the jury is to determine that the verdict returned is actually the verdict of each individual member." *State v. Morelock*, 164 N.W.2d 819, 823 (Iowa 1969). In considering the totality of circumstances, we look for "any hesitation, comments,

or body language from the jurors during polling that would indicate coercion during the return of the verdict or in the motion for a new trial." *Davis*, 975 N.W.2d at 20.

Church concedes that the jurors displayed no signs of coercion when polled. But he contends this factor should not figure heavily in our analysis because of the highly publicized nature of the trial and presence of media in the courtroom while the court polled the jury. He claims it should be "no surprise" that the holdout juror did not want to spotlight themselves after repeated clashes with the eleven other jurors and the court's *Allen* charge. We agree that while hesitation among polled jurors would be a sign of coercion, their lack of hesitation may not be a reliable indicator that no coercion occurred. Especially when jurors are asked to confirm their verdict in front of the media in a high-profile murder case. But we are bound by precedent to recognize polling as a factor weighing against coercion in our analysis. *Id.* at 21.

With the time-of-deliberation ratio tipping toward coercion but the post-verdict polling and content of the instruction tipping away, we shift to the two most salient circumstances in this case. Those circumstances are the district court's unsolicited knowledge of the eleven-to-one jury split. And the unique stress placed on that minority juror is revealed in the harsh tone of the foreperson's notes to the court. In three separate notes, the jury expressed its frustration with that lone juror's refusal to "follow the rules" and unwillingness to join the majority. As Church argues, "any verdict urging instruction would clearly target the holdout and add to the pressure the juror had already been undergoing."

The State contends that *Piper* forecloses Church's argument that the "unsolicited disclosure of a numerical split on the jury makes an otherwise benign

instruction coercive and prejudicial." In *Piper*, the jury deliberated "for three full days and two half days" before sending notes to the court stating they were deadlocked "ten guilty," one "not guilty," and one "not sure." 663 N.W.2d, at 910–11. In response, the court directed the jury to an instruction on deliberations included in the original set of instructions.[8] *Id.* at 911. The jury returned a guilty verdict about eleven hours later. *Id.* Piper challenged the court's directive as coercive. *Id.* On appeal, our supreme court rejected Piper's challenge, considering, among other factors, that "the [district] court did not inquire into the voting breakdown, albeit that information was volunteered by the foreperson in the notes sent to the trial judge." *Id.*

---

[8] That original instruction stated:

> When you begin your deliberations, you should select a foreperson. He or she shall see that your deliberations are carried on in an orderly manner, that the issues are fully and freely discussed, and that every juror is given an opportunity to express his or her views.
>
> In order to return a verdict, each juror must agree to it. Your verdict must be unanimous.
>
> It is your duty as jurors to consult with one another and reach an agreement, if you can do so without compromising your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with the other jurors.
>
> During your deliberations, do not hesitate to re-examine your view and change your opinion if convinced it is wrong. But do not change your opinion as to the weight or effect of the evidence just because it is the opinion of the other jurors or for the mere purpose of returning a verdict.
>
> Your attitude at the beginning of your deliberations is important. It is not a good idea for you to take a position before thoroughly discussing this case with the other jurors. If you do this, individual pride may become involved and you may later hesitate to change an announced position even if shown it may be incorrect. Remember, you are not partisans or advocates but are judges—judges of the facts. Your sole interest is to find the truth and do justice.

We do not read *Piper* as precluding our consideration of the district court's knowledge of a jury split when the jury volunteers that information instead of the judge asking for it. In fact, *Piper* mandates that we evaluate the supplemental charge in context and "under all the circumstances." *Id.* at 911–12. When scouring the record for the possibility of coercion, we may weigh whether the jury advised the court of its numerical division.[9] *See Campbell*, 294 N.W.2d at 811 (weighing fact that court was not "informed by the jury of any ratio of disagreement"); *State v. Concord*, 154 N.W. 763, 766 (1915), *overruled on other grounds by State v. Poffenbarger*, 87 N.W.2d 441 (1958) (finding decision to give "cautionary instructions" was "of doubtful propriety" after "being advised that the jury stood eleven to one"); *Power*, 2014 WL 2600214, at *5 (noting fact that "court was not informed of the ratio of disagreement" in coercion analysis).

The weight to give that knowledge varies with each case. Here, we do not suggest that the court knowing the jury's eleven-one split, by itself, prohibited an *Allen* charge. True, the risk of coercion may be greater in an eleven-to-one split because the lone juror has no ally to reinforce their position. Not every holdout juror has the tenacity to be Juror #8 in *Twelve Angry Men.* (Orion-Nova Productions 1957).[10] But Church is not asking for, and we are not carving out, a special rule for lone holdouts. The question is whether the court's actions, knowing

---

[9] It may be best practice for trial courts to follow advice from Justice Burger and admonish "every jury at the time it retires that it must not reveal the standing of its vote at any time to anyone, including the trial judge, but to report only a verdict or inability to reach one." *Mullin v. United States*, 356 F.2d 368, 370 (D.C. Cir. 1966).

[10] Indeed, "it's not easy to stand alone against the ridicule of others." *Id.*

the split, risked coercing the minority juror to "abandon their honest convictions" to reach a verdict. *Brewster v. Hetzel*, 913 F.3d 1042, 1053 (11th Cir. 2019).

Critical to our decision, the district court knew more than just the split. It knew that the jury had turned its ire on the lone holdout. In three consecutive notes, the foreperson accused the holdout of failing to follow the rules set forth by the court. The foreperson even conveyed that the eleven majority jurors had voted that the holdout was "deliberately" breaking the rules and quoted the holdout as saying they did not care. Both the judge and the jurors knew the deadlock was being attributed to the lone holdout and that the court's verdict-urging instruction came as a response to the third complaint about that juror.[11]

Even though the *Allen* charge did not endorse the majority's position, we analyze its coercive effect from the position of that minority juror. *See Smalls v. Batista*, 191 F.3d 272, 280 (2d Cir. 1999) (citing *United States v. Burgos*, 55 F.3d 933, 940 (4th Cir. 1995) ("[Minority jurors] always know their minority status, and if fearfully inclined, may presumably suspect a disgruntled judge can find them out."). Because the minority juror knew the court was aware of the split and the majority jurors' hostility, that juror may well have viewed the supplemental instruction—in response to the third note—as directing the minority to join the

---

[11] The rapidity of these exchanges supports a finding of coercion on this factor. The majority jurors first conveyed their frustration with the minority juror at 10:06 a.m. After the court instructed the jury to keep deliberating, the majority jurors lashed out in a second note at 11:15 a.m. The district court thought that giving an instruction under those circumstances would be improper. Just twenty minutes later, the jury sent a third note, again singling out the minority juror. The court changed its mind and responded to this last note with an *Allen* charge at 12:08 p.m. *See Hooks v. Workman*, 606 F.3d 715, 748 (10th Cir. 2010) (concluding verdict was coerced, in part, because court gave *Allen* instruction within minutes of learning that there was a single holdout juror).

majority.[12]  Our courts have "condemned instructions targeting jurors in the minority by asking those jurors to reevaluate their opinions to possibly conform to the majority."  *See Davis* 75 N.W.2d at 18.  That condemnation should apply to both the content of the instruction and its implication as reasonably perceived by a minority juror.  *Batista*, 191 F.3d at 280 (finding coercion even though "judge never singled out either the minority or the majority" in the instruction).

Along with these salient circumstances, the *way* the district court instructed the jury added to the risk of coercion.  The court decided to give a supplemental instruction rather than refer the jury back to its original instruction on deliberation.  *See Hooks*, 606 F.3d at 749 (explaining that an *Allen* charge separate from and later than other instructions risks jurors giving disproportionate weight to the new charge).  The district court did not follow best practices.  *See Davis*, 975 N.W.2d at 22 (advising trial judges that the "best option is to closely follow the process set out in *Piper* and utilize the approved ABA/ISBA instruction described in *Campbell* in the initial instructions and remind the jury of this initial instruction if the jury is deadlocked").  We recognize that the district court did not have *Davis* for guidance when making its decision.  But diverging from the *Piper* process contributed to the coercive nature of the instruction.

After considering the totality of circumstances—which includes an unusually open expression of animosity from the majority jurors toward the lone holdout—we

---

[12] Reviewing similar facts, a federal circuit court found that an *Allen* charge was coercive.  *United States v. Sae-Chua*, 725 F.2d 530, 532 (9th Cir. 1984).  In that case, the judge was aware of an eleven-to-one split on conviction.  And the foreperson expressed the belief that the holdout's persistence in voting not guilty was "improper behavior."  *Id.* at 531.  The court held: "Under these circumstances the charge could only be read by the dissenting juror as being leveled at him."

find that the district court should not have given the supplemental instruction. This case differs from *Davis*, where the court's verdict-urging instruction "simply refocused the jurors on their responsibilities to go back to the jury room and consider the evidence and each other's opinions fairly and properly." 975 N.W.2d at 21. In *Davis*, the jury did not inform the court of its numerical division, only that it was deadlocked. *Id.* And the *Davis* record contained no notes disparaging jurors in the minority. *Id.* It also differs from *Piper*, where the court knew the ten-two split, but received no information that the majority jurors negatively viewed the minority jurors as not "following the rules." Unlike *Davis* and *Piper*, the circumstances here left the minority juror particularly vulnerable to the coercive effect of the *Allen* charge. So giving it was an abuse of discretion.

For more than a century, our courts have safeguarded the "fundamental right" of litigants to have their jury trial "determined by an unanimous verdict, which has the assent of every member of the panel." *Clemens v. Chicago, R.I. & P. Ry. Co.*, 144 N.W. 354, 358 (1913). This fundamental right is based on the principle that "[i]t is not the purpose of the trial to secure *a* verdict, but rather *the* verdict of the jury, in all the fullness of the meaning of the word itself, independently and freely assented to by each member of the panel." *Id.* (emphasis in original). Because Church's right to *the* verdict of all the jurors was prejudiced, we reverse and remand for a new trial.

**REVERSED AND REMANDED.**